121 N.J. Super. 487 (1972)
297 A.2d 873
STATE OF NEW JERSEY, PLAINTIFF,
v.
JACK THYFAULT AND THERESA SIRIMARCO, DEFENDANTS.
Superior Court of New Jersey, Essex County Court, Law Division (Criminal).
Decided December 4, 1972.[1]
*491 Mr. Alan Silber, Assistant Prosecutor, for the plaintiff (Mr. Joseph P. Lordi, Prosecutor of Essex County, attorney).
Mr. Thomas E. Durkin, Jr., for defendants.
HANDLER, J.S.C., Temporarily Assigned.
This is a criminal prosecution in which defendants Jack Thyfault and Theresa Sirimarco are charged in separate counts with the crimes of conspiracy, obtaining money by false pretenses, impersonation, embezzlement and attempted obtaining money by false pretenses between 1968 and 1971. Trial by jury was waived by defendants.
*492 Jack Thyfault for many years had been in the business of repossessing automobiles to enforce liens, a business subject to the Garage Keepers Lien Act, N.J.S.A. 2A:44-20 et seq. He operated this business under the name of Major Auto Recovery Service at 21-23 Jacob Street, Newark, a two-story building with an office in the basement and an adjoining garage. For a long time Theresa Sirimarco lived with Thyfault as his wife although they were not lawfully married until August 1971. She assisted actively in the business by answering the telephone, giving information, repossessing vehicles, collecting moneys for the release of vehicles, giving receipts and transmitting moneys to lien holders and claimants.
Major Auto's customers were owners of garages or gas stations and others in the business of repairing or rendering services in connection with motor vehicles, those who had claims for work performed upon automobiles and required the enforcement of such claims and liens. Major Auto apparently obtained customers through advertisements such as calendars, flyers and its listing in the telephone directory; some customers had come to know of Major Auto by word-of-mouth.
In a typical case, the owner of a gas station or garage would call in response to such an ad or reference and inquire as to whether and under what conditions Thyfault would offer his services in the enforcement of liens. Thyfault usually indicated that he would repossess or pick up any vehicles, that he would collect from the car owner all moneys due for the payment of any outstanding claims, and that his services would not cost the garageman anything. He created the impression that in this business he was a constable. Some of his advertising material, the telephone listing and signs in and on the premises indicated that defendants were "constables." On a particular job defendants would usually get a request from such a garage owner over the telephone to repossess a car. The amount of the bill, the make of the car, the name of the owner and such pertinent *493 information would be given defendants. Utilizing this information defendants themselves would prepare a form warrant which purported to authorize Major Auto, as the agent of the particular claimant, to repossess a vehicle to enforce the lien under the Garage Keepers Lien Act. Ordinarily these warrants were not first prepared, completed or executed by the lien claimant prior to their use by defendants in the enforcement of liens. Moreover, defendants did not prior to a repossession verify with the claimant as to whether he had made any personal or written demand upon the car owner for the payment of the outstanding bill.[2]
When a car had been repossessed by defendants, ostensibly pursuant to such a warrant, they would demand of car owners the amount of money inserted in the warrant as the outstanding bill and also for an additional sum, a flat $55 which varied slightly in some cases. Only upon request, when pressed, would they inform car owners as to the basis of this additional charge. They frequently stated the $55 was for towing or storage and also, from time to time, it was said to include "interest," "fees" or "constable fees." It did not appear that defendants actually calculated their cost for towing or storage, although there was a storage rate of $3 a day which was charged in some situations. It is inferred that the $55 charged to car owners was intended as a fee to compensate defendants for their services, since no additional charge for fees or expenses was ever made by defendants upon the lien claimant and, in this sense, the services rendered defendants did not cost a garagekeeper anything.[3]
*494 Defendants during times set forth in the indictment were not constables. At one time prior to October 1970 Sirimarco had been a duly appointed constable, but Thyfault had never held that office. Yet defendants frequently represented or held themselves out to be constables. As noted they used advertising materials and signs using the term "constables." They also indicated to garagemen who solicited their services that they were constables. This was used to secure business and was designed to convey the impression that their enforcement of liens would be particularly effective and efficient. With respect to car owners whose vehicle had been seized it was suggested unmistakenly in most cases that they were dealing with "constables" who were knowledgeable and vested with authority to enforce such claims and collect all moneys demanded. This ploy was to stifle resistance on the part of the car owners and to impel them to pay all sums demanded without further remonstrations or protests.
Thirteen counts of the indictment charge Thyfault, and another separate count charges Sirimarco, with the crime of impersonating a public officer, contrary to N.J.S.A. 2A:135-10. That statute provides that "[a]ny person who, without authority, exercises the functions of, or holds himself out to anyone as, an officer or employee of the state or any agency or political subdivision thereof, not so being, is guilty of a misdemeanor." It has been contended that a "constable" is not an officer or employee within the intendment of this criminal statute.
N.J.S.A. 40:41-34 et seq. provided for the office of constable.[4] Pursuant thereto persons were elected to that *495 office by governing bodies of municipalities; the number of constables for each municipality was restricted; the term of office was limited; the filling of vacancies was included; a statutory oath for the performance of duties was mandated, and the furnishing of a bond conditioned upon the faithful performance of a constable's duties was required. A myriad of other statutes indicate the numerous and varied duties which devolve upon a constable.[5] Such duties are closely analogous to those of other recognized law enforcement officers.
It has been recognized that "[g]enerally, a constable is an officer of a municipal corporation, usually elected, whose duties are similar to those of sheriff, although his powers are less and his jurisdiction smaller." 80 C.J.S. Sheriffs and Constables § 3 at 154 (1953). "A constable is a public officer, and generally speaking the duties are to be vigilant, to preserve the peace." 47 Am. Jur., Sheriffs, Police and Constables, § 34 at 845 (1943). It would appear that a person enjoying the official status of "constable" should be considered a public officer and, in that sense, "an officer * * * of the state or * * * political subdivision thereof * * *." (N.J.S.A. 2A:135-10).
[A] "[P]ublic officer" has been defined as an incumbent of a public office; an individual who has been appointed or elected in a manner prescribed by law, who has a designation or title given him by law, and who exercises the functions concerning the public assigned to him by law.
A person whose duty it is to perform an agency for the state, ... a person appointed or elected to perform a designated duty concerning the public; one who performs a public function, whose authority is derived directly from the state by legislative enactment, and whose duties, powers, and authority are prescribed by law. [67 C.J.S. Officers § 2 at 101-102 (1950)]
*496 The statutory history of N.J.S.A. 2A:135-10 is instructive. Its predecessor, R.S. 2:160-11, delineated those officers or employees the impersonation of which would constitute a crime. That list included specifically the office of constable as well as many others, such as deputy sheriff, marshal, policeman, or other police officer, a plumbing, sanitary, food and drug or milk inspector, or other accredited employee of the Department of Alcoholic Beverage Control or of the State Tax Department. The current statute is an enlargement, not a constriction, of the types of officers or employees included within its ambit. Thus, a constable is an officer within the intendment of N.J.S.A. 2A:135-10.
The gravamen of the crime of false personation consists of falsely representing some other person or acting in a character unlawfully assumed in order to deceive others, and thereby gain some profit or advantage, or enjoy some right or privilege, appertaining to the party so personated. The false pretense of being a person of the class or character designated in the statute is the gist of the offense. 35 C.J.S. False Personation § 3, at 794 (1960). To "[p]ersonate ordinarily means to pass one's self off as another, to play the part or assume the character of, another." Lane v. United States, 17 F.2d 923, 924 (6 Cir.1927). Such false personation can be accomplished by actions or conduct or by outward indicia such as signs or advertising. It is a holding out whereby a person induces others to believe that he can lawfully engage in a particular activity or exercise certain authority. State v. Kelsey, 46 Wash.2d 617, 283 P.2d 982 (Sup. Ct. 1955). What is essential is the intentional representation reasonably calculated to give rise to the belief that the defendant occupied a particular office. Heskett v. United States, 58 F.2d 897 (9 Cir.1932). Such holding out or false personation may involve verbal declarations as well as other manifestations of authority. Pierce v. United States, 86 F.2d 949 (6 Cir.1936). It is also requisite that any false personation be accomplished with fraudulent intent, which is an an essential element of the offense. Lamar v. United States, *497 241 U.S. 103, 36 S.Ct. 535, 60 L.Ed. 912 (1916); Russell v. United States, 271 F. 684 (9 Cir.1921); Wharton's Criminal Law and Procedure, § 592 at 334 (1957); 32 Am. Jur. 2d., False Personation, § 6 (1967).
In this case defendants engaged in false personations of the office of constable; these were undertaken with a design to deceive others and to gain some profit or advantage. Such personations were accomplished by outward manifestations of that office as well as verbal affirmations on numerous occasions. They were done with a fraudulent intent to gain and secure business and to effectuate the collection of moneys with a minimum of difficulty, even though sums demanded may not have been chargeable or may have otherwise been lawfully protested by car owners. (See discussion, infra). It is concluded that Jack Thyfault and Theresa Sirimarco are guilty of the crime of impersonation as set forth in counts 3, 7, 9, 11, 13, 15, 17, 19, 21, 23, 28, 31, 34, count 37, and count 26, respectively.
Thyfault is also charged with embezzlement of moneys, contrary to the provisions of N.J.S.A. 2A:102-5. The elements of embezzlement are settled. There must be a relationship such as that of employment or agency between the owner of the money and defendant; the money alleged to have been embezzled must have come into the possession of defendant by virtue of that relationship; there must as well have been an appropriation or conversion of that money, and such must have been intentional and fraudulent. State v. Kennedy, 61 N.J. 509 (1972); State v. Daly, 38 N.J. 1 (1962); State v. Hubbs, 70 N.J. Super. 322 (App. Div. 1961).
Thyfault repossessed several cars upon the oral instructions of Charles Gehrig, the proprietor of a garage called Far Hills Esso to enforce claims for work done. He collected moneys from the respective car owners. The moneys collected were those demanded by Thyfault. They included his flat "charge" of $55 plus some additional charges as well as the amounts constituting Gehrig's bills. These bills were the *498 bases of the liens which Thyfault was enforcing. One such repossession and collection occurred in April 1968; two others were on May 25 and June 26, 1970. Thyfault, as the authorized agent of Gehrig, was obligated to hold and remit these moneys to him. Eventually these monies were paid to Gehrig, but this occurred in August 1972, after Thyfault was indicted for the embezzlement of these sums. He had received those moneys as the agent of Gehrig, and as Gehrig's agent he was entrusted with their collection and remittance. It is inferred from his failure to remit that he intended not to return these moneys to Gehrig. His explanations for nonpayment, not otherwise substantiated, such as the destruction of his records through fire and theft, were a fabrication. Thus, Thyfault's failure to remit these sums, coupled with the intent not to pay his principal, constituted an unlawful conversion of these moneys. It is determined that Thyfault is guilty of the crime of embezzlement, as charged in counts 29, 32, and 33 of the indictment.
Defendant Thyfault is charged in various counts with the crime of obtaining money by false pretenses or representations, contrary to the provisions of N.J.S.A. 2A:111-1. It is alleged that with intent to cheat and defraud, he did represent that he was a public official, to wit, a constable; that he was authorized to tow vehicles of particular persons, and that those persons in effect were required to pay him the amount of money that was owed to the holder of the garagekeeper's lien, plus certain sums of money for expenses, towing fees and storage; whereas in truth, as alleged in the indictment, Thyfault knew that he was not a constable, and that the particular persons involved did not have to pay any sum for the expenses, towing fees and storage, and, in fact, that the law of this State forbids such expenses, towing fees and storage from being charged to the owner of the vehicle towed or repossessed pursuant to a garagekeeper's lien. In essence, Thyfault is accused of misrepresentations involving the enforcement of liens under the Garage Keepers Lien Act.
*499 N.J.S.A. 2A:44-21 provides that a garagekeeper who has stored, maintained, kept or repaired a motor vehicle or furnished gasoline, accessories or other supplies at the request or with the consent of the owner, shall have a lien upon the motor vehicle for the sum due therefor. Such a garagekeeper may without process of law detain the vehicle at any time it is lawfully in his possession until the sum is paid; if the motor vehicle has been removed from his control with permission, he may without further process of law seize the vehicle peacefully and without force, after he has made a demand of payment of his claim, either personally or by registered mail. N.J.S.A. 2A:44-22. It is emphasized that the amount of this lien is limited precisely by the statute to the sums that are due for the storing, maintaining, keeping or repairing of a motor vehicle, or furnishing gasoline, accessories or other supplies by the garagekeeper.
Under N.J.S.A. 2A:44-23 the owner of the vehicle so detained may immediately demand from the garagekeeper or the person in charge thereof a statement of the true amount claimed to be due by the garagekeeper for the storing, maintaining, keeping or repairing of such motor vehicle, or for furnishing gasoline, accessories or other supplies thereto. A repossessor or person who has seized a vehicle to enforce such a lien is required to furnish such a statement, and that statement must consist of those items which constitute the basis of the garagekeeper's claim and lien. This statutory section further provides that upon the receipt of such a statement, if the owner of the vehicle considers it to be excessive, he may offer what he considers to be reasonably due and demand possession. If this is refused, he may nonetheless obtain possession by depositing the amount claimed in the statement with the clerk of the court, together with certain statutory costs. Upon such deposit he becomes entitled to possession of his motor vehicle. N.J.S.A. 2A:44-24. If an owner does not endeavor to recapture his motor vehicle, the garagekeeper, to effectuate his claim and lien, may cause the vehicle to be sold at public auction. N.J.S.A. *500 2A:44-29. The proceeds of the sale must be applied to the payment of the lien and the expenses of the sale. Under no circumstances, even in the event of such a sale, is anyone other than the owner of the vehicle entitled to any balance that might be realized over and above the amount of the lien and the expenses of the sale. N.J.S.A. 2A:44-31.
There is a paucity of decisions construing the correlative rights and duties of garagekeepers and car owners under the Garage Keeper's Lien Act. Wallace v. Terpis Garage, 17 N.J. Misc. 183, 7 A.2d 795 (D. Ct. 1939) held that under the act the garagekeeper is not entitled to claim any amount over his bill which might be attributable to fees and expenses expended in the seizure of an automobile. The court concluded that such fees and expenses were not specifically authorized by statute and, since the lien created by statute is in derogation of the common law and to be strictly construed, such additional charges should be disallowed. See also, Onondaga Truck Lease Inc. v. Hovell, 107 N.J. Super. 463 (Cty. Ct. 1969), aff'd 111 N.J. Super. 549 (App. Div. 1970).
The law pertaining to the garagekeeper's lien is explicit that persons engaged in the repossession of automobiles, be they garagekeepers or their authorized agents, in order to enforce garagekeepers' liens, are not authorized to exact from car owners any sums reflecting costs, charges or expenses incident to the seizure of vehicles. Absent a sale, the only amount that may be demanded and collected from an owner whose car is subject to a lien under the Garage Keeper's Lien Act is the amount of the garageman's bill. But not everyone engaged in the business of enforcing such liens may share in this legal understanding or actually know this to be the law.[6]
*501 The crime of false pretenses requires not only that there be a misrepresentation, but that such false representation be made by a defendant having actual knowledge that it is false and with a specific intent to cheat or defraud. State v. Greco, 29 N.J. 94 (1959); State v. Samurine, 47 N.J. Super. 172 (App. Div. 1957), rev'd per curiam on other grounds, 27 N.J. 322 (1958). There is a reasonable doubt that Thyfault had actual knowledge that the law did not authorize him to charge car owners for his expenses of towing and storage or his fees for services rendered on behalf of garagemen, or that a collection of such fees or expenses from car owners was prohibited by law. But his overcharges per se do not constitute the essence of his misrepresentations. He represented to car owners that he was a constable. That representation was false. Moreover, he did not merely charge owners for amounts in excess of the garageman's bill and represented to car owners that they were obligated to pay such fees. He represented that owners could not secure the return of their vehicles unless such moneys were paid. This was false. Owners on demand were entitled to a statement of the bill or claim, and, if disputed, to pay such sums into court and thus secure the possession of their vehicles. None of these rights was ever stated or intimated by Thyfault to car owners.
*502 Some of Thyfault's misrepresentations involved legal propositions. That such a misrepresentation may be the basis of the criminal charge of obtaining moneys or other things of value by means of false representations, contrary to N.J.S.A. 2A:111-1, has not been adjudicated in this jurisdiction. It has been held elsewhere that such a misrepresentation, while it might give rise to actionable fraud, does not constitute a criminal offense. State v. Edwards, 178 Minn. 446, 227 N.W. 495 (Sup. Ct. 1929). The majority in Edwards conceived that one unlettered in the law, even though the victim of another's fraud, could not take refuge in his own ignorance. The dissent, making more sense, stated that the maxim that ignorance of the law excuses no one was not intended and ought not to be used to enable a wilful wrongdoer to protect himself from the consequences of his act because of his victim's lack of legal knowledge. To use the maxim to that end, as held in Ryan v. State, 104 Ga. 78, 30 S.E. 678 (Sup. Ct. 1898), is a perversion of it. Cf., Brock v. Weiss, 44 N.J.L. 241 (Sup. Ct. 1882). Moreover, where one party possesses or professes to possess superior knowledge of the law and is thereby in a position to take advantage of another person's ignorance and to mislead him, he should not be shielded by his victim's vulnerability. Meacham v. Halley, 103 F.2d 967, 971 (5 Cir.1939).[7] Thus, Thyfault's *503 misrepresentations, involving as they did the untruthful proposition of his being a constable and the erroneous statements that owners were not entitled to obtain their cars unless moneys were paid over and above a garageman's actual bill, were a blend of misrepresentations of fact and law. Such misrepresentations may constitute the basis of the crime of false pretenses.
It is inferred that Thyfault knew the falsity of his representations and that these false representations were uttered with an intent to defraud. This was done to cozen and bully distraught car owners into paying Thyfault all sums demanded and to divert them from disputing these claims or obtaining their cars by pursuing other available remedies. Car owners, by virtue of these pretenses and in reliance thereon, did pay moneys to which Thyfault was not entitled and were effectively deterred from securing the possession of their vehicles by other lawful means.
In some instances persons did not in fact rely reasonably upon any of the false representations of Thyfault. Reliance is an essential element of this crime. State v. Allen, 53 N.J. 250 (1969); State v. Zwillman, 112 N.J. Super. 6 (App. Div. 1970). With respect to these incidents Thyfault's conduct falls short of the crime. It is, therefore, determined that Thyfault is guilty of the crime of obtaining money or other things of value or benefits by false pretenses or representations, as charged in counts 6, 8, 10, 14, 16, 18, 20, 22, 24, 27, 30 and 35 of the indictment; he is not guilty of this crime as charged in counts 2, 12 and 36.
Defendant Sirimarco is charged with the crime of attempted obtaining money by false pretenses in count 25 of the indictment, contrary to N.J.S.A. 2A:85-5, and N.J.S.A. 2A:111-1. The attempt to commit a crime is an act done with intent actually to commit such a crime. It is an act which goes beyond the mere preparation for the commission of the crime. It is such an act as would apparently result in the commission of the crime itself in the usual and natural course of events if permitted to reach fruition. Cf. State v. *504 Weleck, 10 N.J. 355 (1952); State v. O'Leary, 31 N.J. Super. 411 (App. Div. 1954). Such acts must manifest a defendant's intent to perpetrate the crime, although the offense is not actually committed.
Sirimarco attempted to obtain from one Ward, a car owner whose vehicle had been repossessed by her, a sum of money in excess of that claimed by an automobile dealer for work done upon the vehicle. When Ward strongly protested the existence as well as the amount of the bill, Sirimarco represented she was a constable and indicated that Ward would not be able to get his car unless her demands were met. Her representations and conduct bespeak an intent on her part to gain an advantage over Ward. Her representations were knowingly false. When Ward protested strongly and showed his own credentials as a federal employee, Sirimarco was effectively discouraged. She abandoned her efforts to collect the amounts originally demanded and finally released Ward's car on the payment of the repair bill. Sirimarco's statements and actions, while they fall short of the commission of the crime of obtaining moneys or things of value by false pretenses, extended beyond mere preparations therefor. Consequently, defendant Sirimarco is guilty of attempted obtaining money by false pretenses, as charged in count 25 of the indictment.
Defendants are charged in the first count of the indictment with conspiracy. The gist of the crime of conspiracy is an unlawful agreement, that is, an agreement or understanding between persons to violate the law. State v. Dennis, 43 N.J. 418 (1964); State v. Carbone, 10 N.J. 329 (1952). Specifically, the objects of this alleged conspiracy are the substantive crimes previously discussed. Defendants did have such an understanding or arrangement between them and they committed one or more of the acts set forth in the indictment as overt acts in furtherance of the conspiracy. Cf. State v. Malaspina, 120 N.J. Super. 26 (App. Div. 1972). To the extent that the conspiracy endured beyond the date of the marriage between the defendants in August *505 1971, any agreements or overt acts committed thereafter have not been considered. Cf. State v. Struck, 44 N.J. Super. 274 (Cty. Ct. 1957). But such conspiratorial agreement and any overt acts undertaken prior to the lawful marriage between the defendants are not immune from criminal sanction. Accordingly, it is determined that defendants Thyfault and Sirimarco are guilty of the crime of conspiracy, as charged in count 1 of the indictment, between 1970 and August 1971.
NOTES
[1] The opinion in this case was rendered orally from the bench. It has been edited for clarification.
[2] These conclusions are based upon evidence and testimony pertaining to certain gas station or garage owners and their transactions with Thyfault. The court's more detailed factual determinations with respect thereto are omitted.
[3] These determinations are based upon the evidence and testimony relating to the repossessions of vehicles of 16 different persons who appeared as witnesses. For brevity the court has omitted its findings concerning these individual transactions.
[4] The indictment charges offenses on various dates between 1968 and 1971. During that period of time the statute applicable to the office of constable was L. 1922, c. 151; N.J.S.A. 40:41-34 et seq. This statute was superseded by L. 1971, c. 200, eff. July 1, 1971; N.J.S.A. 40A:9-120 et seq.
[5] Research through the computer facilities at Health Law Institute, Pittsburg, Pennsylvania, discloses that 174 statutes deal with the subject of "constables."
[6] For example, the clerk of the Essex County District Court testified that he was familiar with the provisions of the Garage Keeper's Lien Act and procedures thereunder. It was his understanding of the law that repossessors were not authorized to exact payments over and above the garagekeeper's bill. An unofficial form of warrant purports to authorize the agent-repossessor to enforce the lien against a particular car owner indebted to the garagekeeper or automobile repairman; it provides for the sum which is due for storing, maintaining, keeping or repairing said motor vehicle, or furnishing gasoline, accessories or other supplies in the exact language of the statute. But this warrant further purports to authorize the agent to take the property and detain it until said sum due and expenses are paid, and if not paid, to hold the property for sale; and upon such sale to apply the proceeds to the payment of the lien and the expenses of seizing, impounding and selling a motor vehicle. In this respect, the warrant does not appear to be in conformity with the statute. Since it is widely used, perhaps under color of judicial sanction, it could give the impression to one engaged in the business of repossessing vehicles that expenses incidental to the repossession of a vehicle, in addition to the claim of the garagekeeper, are collectible from the car owner.
[7] It is noted that the New Jersey Criminal Law Revision Commission adopted the reasoning of Ryan v. State, supra, in its Penal Code, § 2C:20-4. The commentary indicates, "We follow the decisions that impose liability whenever a defendant obtains property by a knowing misstatement of the law." New Jersey Penal Code § 2C:20-4(8)(c), commentary, at 226 (1971). See Model Penal Code § 206.2, comment (tent. draft No. 2, 1953).

The Penal Code further clarified its position concerning misrepresentations of law, as well as the present state of the law, by commenting that no New Jersey cases were found on deceptions as to the law. The Code as written, however, does not exclude such false representations of law. It noted conflicting precedents elsewhere on criminal liability for obtaining property by false representations as to the relevant law. Ibid.