235 N.J. Super. 75 (1989)
561 A.2d 647
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN F. GRIMES, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 8, 1989.
Decided July 19, 1989.
*77 Before Judges BILDER, R.S. COHEN and A.M. STEIN.
Stephen W. Kirsch argued the cause for appellant (Francis J. Hartman, attorney).
Robert E. Bonpietro, Deputy Attorney General, argued the cause for respondent (Donald R. Belsole, Acting Attorney General, attorney).
The opinion of the court was delivered by R.S. COHEN, J.A.D.
*78 Defendant John F. Grimes, a 64 year old retired railroad employee and, since 1962, a part-time constable, was indicted in 1985 for one count of official misconduct, contrary to N.J.S.A. 2C:30-2. Defendant was convicted and sentenced to two years' probation, a $750 fine, and 200 hours of community service. He appealed; we reverse and order the indictment dismissed.
Much of the evidence was not in dispute. Defendant was designated a constable of the Burlington County District Court, and of its successor, the Superior Court, Law Division, Special Civil Part. See N.J.S.A. 2A:4-3; 2A:18-1. He was assigned in 1985 to serve a Special Civil Part warrant to remove John and Sophie Libucki from a house they rented from Frank Capece. The warrant was issued after Capece obtained a judgment for possession for nonpayment of rent. Before serving the warrant, defendant arranged with a locksmith and a police officer to accompany him to the premises on February 6, the locksmith to lock the tenants out and the police officer to prevent physical confrontation. For this service, defendant charged Capece $30, the maximum fee set by a standing memo of the Presiding Judge of the Special Civil Part "for added services in an eviction." Defendant also advised Capece that he was available in a private capacity[1] to assist in keeping the peace when the Libuckis came back to retrieve their furniture and clothes. He warned Capece that problems could arise if Capece and the Libuckis went to the house by themselves.
Capece and the Libuckis agreed on the terms of removal of the Libuckis' goods, which the Libuckis required to be done on Saturday, February 9. Capece called defendant, who advised that the fee for his attendance was $150. Capece called the *79 Libuckis' son and told him they would have to pay the charge. They communicated with county prosecutor's detectives who furnished three marked $50 bills and stood by. Libucki tried to give the money to defendant, who protested that he was working for Capece. After defendant walked away, Libucki handed the money to Capece, who followed defendant and gave it to him. A few minutes later, defendant was arrested.
Defendant makes two arguments on appeal, one addressed to the conduct of the trial, the other to the sufficiency of the charges against him. We address them both.
Defendant first complains that the trial court should not have admitted the opinion testimony of one of the State's witnesses on the nature of the office of constable, its scope and responsibilities. The witness testified that defendant's charging $150 to oversee the removal of the tenant's goods was not an authorized act; that defendant used his official position for private profit; that defendant violated R. 1:17-4 by operating the private business without prior approval of the Assignment Judge, and that such approval would not have been granted.
Defendant's complaint has two aspects. First, he says that the expert opinion was on matters of New Jersey law, a subject on which no expert testimony should have been received. The second aspect is that the expert witness was the Assignment Judge of the vicinage in which the trial was conducted, and that he in particular should not have been permitted to give his opinion on the law and on defendant's guilt.
The nature of the office of constable, its duties and responsibilities, are matters of law. See State v. Maioranna, 225 N.J. Super. 365 (Law Div. 1988). Where the statutory law is incomplete or unclear, as it is here, a court should take judicial notice of those duties which arise out of the nature of the office. State v. Weleck, 10 N.J. 355, 366 (1952); State v. Deegan, 126 N.J. Super. 475, 492 (App.Div.), certif. den. 65 N.J. 283 (1974); State v. Stevens, 203 N.J. Super. 59, 64-65 (Law *80 Div. 1984). It is the court's function to ascertain the law and explain it to the jury.
Expert opinion testimony is not admissible concerning the domestic law of the forum. Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505 (2 Cir.), cert. den. 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); Loeb v. Hammond, 407 F.2d 779 (7 Cir.1969); VII Wigmore, Evidence, § 1952 (Chadbourn Rev. 1978); McCormick, Evidence, § 12 (3d ed. 1984). The reason is that there is a judge presiding over the trial
whose exclusive province it is to instruct the jury on the law. The danger is that the jury may think that the "expert" in the particular branch of the law knows more than the judge  surely an inadmissible inference in our system of law. [Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d at 512].
Questions of law existing in the trial judge's mind may, of course, be resolved after considering briefs and arguments of counsel. Foreign law, on the other hand, is a proper subject for expert testimony. Title Guarantee & Trust Co. v. Trenton Potteries Co., 56 N.J. Eq. 441 (E. & A. 1897); Max v. Max, 123 N.J.L. 580 (Sup.Ct.), aff'd o.b. 125 N.J.L. 271 (E. & A. 1940).
The Assignment Judge's testimony was not only inadmissible; it was tremendously harmful. The chief judge of the vicinage, who described himself to the jury as the person who is "charged with the responsibility for running the court system in the county," joined the prosecutor not only in proving to the jury the limits of defendant's duties and privileges, but also in sponsoring to them the conclusion that defendant had acted in an unlawful manner.[2] Even if the judge's testimony were in all respects accurate (as to which we do not comment), there would be no justification for placing the great weight of his judicial office on the prosecution's side of the scales.
*81 A judge is prohibited by Canon 2B of the Code of Judicial Conduct to testify as a character witness. The Commentary explains:
The testimony of the judge as a character witness injects the prestige of the office into the proceeding in which the judge testifies and may be misunderstood to be an official testimonial.
The same considerations would bar a judge's appearing as an expert witness, if opinion testimony on local law were admissible. We can envision no circumstance that would justify creating the prejudice inherent in permitting the State to present a New Jersey judge to give opinion testimony on the law.[3]See Helmbrecht v. St. Paul Ins. Co., 117 Wis.2d 74, 343 N.W.2d 132 (Ct.App. 1983), aff'd in part/rev'd in part on other grounds 122 Wis.2d 94, 362 N.W.2d 118 (1985); Merritt v. Reserve Ins. Co., 34 Cal. App.3d 858, 110 Cal. Rptr. 511 (1973); Commonwealth v. Connolly, 217 Pa.Super. 201, 269 A.2d 390 (1970).
The conviction has to be reversed. We must also deal, however, with defendant's argument addressed to the indictment, which is that his actions were outside of the scope of his official functions; that he was therefore acting in a private capacity and was not subject to the official misconduct statute. N.J.S.A. 2C:30-2.
The indictment, consistent with N.J.S.A. 2C:30-2a, alleges that defendant
with purpose to obtain a benefit for himself did commit an act relating to his office but constituting an unauthorized exercise of his official functions to wit: solicited and accepted an unauthorized fee for service knowing that such act is unauthorized.
The gist of the indictment is that defendant solicited and accepted the $150 fee for performing his functions as constable knowing that he was not permitted to do so.
The case was somewhat more complex when it was submitted to the jury after an eight-day trial. The jury was instructed *82 that, in order to convict, there must be proof beyond a reasonable doubt of four elements. The first was that defendant was a "public servant." The second was that defendant committed an act relating to his office, but which constituted an unauthorized exercise of his official function. Third was that defendant knew that his act was unauthorized, and fourth was that he acted for the purpose of obtaining a benefit for himself.
The first and fourth elements were really not problems. The statute applies to public servants. Defendant was a constable and, as such, a court officer and, within the meaning of N.J.S.A. 2C:27-1g, a public servant. As to the fourth, the jury was plainly justified in concluding defendant acted to obtain a benefit for himself even under his thesis that the $150 was to go to a business half-owned by his wife.
The complexity of the case grew in relation to the second and third elements. As to the second, the State had to prove that defendant committed an act relating to his office but constituting an unauthorized exercise of his official function. The court told the jury it could find that to be so on a number of different bases:
(1) Because defendant was rendering services to a landlord relating to an eviction, he could charge no more than $30. In this respect the court instructed, apparently as a matter of law, that a constable's charges relating to an eviction were governed not only by statute but also by local memos of presiding judges setting forth the $30 maximum.[4] Defendant's position, according to the court, was that the services defendant provided for $150 were beyond those contemplated by the memo and were provided in a private capacity.
(2) Alternatively, defendant's acts were unauthorized because defendant could not be a representative of Assured Services without seeking approval of the Presiding Judge of the Court and the Assignment Judge of the vicinage, and that he did not seek such approval. The court reminded the jury of the Assignment Judge's expert testimony that defendant did not comply with R. 1:17-4 and that, if he had sought approval, it would have been denied as creating a conflict of interest. The court added that the purpose of R. 1:17-4 *83 was to insure that court officers were not engaged in "such conflict of interest."
(3) A third possibility was that of defendant's "soliciting business" for Assured Services, Inc. The court charged the jury that the solicitation itself could be a basis for finding defendant guilty. The charge said:
with regard to the solicitation, you will determine... whether ... those act or acts were unauthorized for any of the enumerated reasons, either by reason of conflict of interest, by reason of his failure to comply with the rules of the court or his failure to comply with the memorandums of court that would set an outside fee for a constable for extra services related to a conviction at $30.00.
Thereafter the charge turned to the element of knowledge. The court said:
In this case, you must determine whether John Grimes solicited business on behalf of Assured Services and carried out eviction-related services on behalf of the business, either aware that he was required to obtain prior written Court approval and authorization before engaging in such activities, and that he knew and was aware that he had not obtained such approval or authorization, or you must be convinced beyond a reasonable doubt that he was aware that he had a duty not to engage in conduct which resulted in a conflict of interest with his duties as Constable and aware at the time he acted, his conduct was practically certain to result in a conflict of interest, or you must determine that he was aware that the acts he performed were related to the duties of Constable in carrying out Court ordered eviction; and thus, he was bound by the Court fee schedule and the statutes of the Court; that is, he could not obtain $150.00 for services such as he was rendering, but instead was limited to a $30.00 maximum fee.
As we understand it, the conviction choices presented to the jury were: (1) the services provided by defendant to Capece were constable's services related to an eviction, defendant knew that and knew he should not have charged more than the permitted $30; (2) defendant's services were private, not constable's services, and defendant knew he should not have performed them without seeking judicial approval under R. 1:17-4;[5] or (3) defendant solicited eviction-related business, either (a) knowing it was private business and he had no R. 1:17-4 approval, or (b) knowing that he had a duty to avoid conflicts of *84 interest and that his conduct was practically certain to result in a conflict of interest, or (c) knowing that the business he was soliciting was eviction-related constable's duty and thus could charge only $30.
The difficulty with all this, of course, is that the State took five different and conflicting paths to conviction, and as to each one of them invited the jury to find beyond a reasonable doubt that defendant knew when he acted that the path he took was unlawful. For example, the jury was invited to find, beyond a reasonable doubt that defendant's services either (1) were constable's work and he knew it, or (2) were not constable's work and he knew it. At the very least, asking the jury to convict on its choice among opposing factual and legal theses, and its choice among inconsistent states of defendant's mind[6] underscores that the law creating and limiting the office of constable is unclear.
The uncertainty of the law is also shown by the conflicting language of prior rulings on the subject. N.J.S.A. 2A:18-57 directs a constable serving a warrant for removal to put the landlord in full possession of the premises. Township of Union v. Bayliss, 40 N.J.L. 60, 63 (Sup.Ct. 1878) says that the statute means:
The constable had a right to give the tenants an opportunity to remove their goods, or to remove them himself, as the agent of the plaintiff, but he was under no legal obligation to aid in removing them. [Emphasis supplied].
Citing only the statute and Bayliss for authority, the Appellate Division said 77 years later:
It is not the duty of the constable to remove the tenant's goods from the premises; he must give the tenant an opportunity to remove his goods, or remove them himself as agent of the landlord. [Gargano v. Venezio, 38 N.J. Super. 127, 130 (App.Div. 1955).]
The two rulings are subtly but significantly different. In Bayliss, the constable has the right either to let tenants take *85 their goods or to move them himself, and the clause, "as agent of" the landlord, can be read to apply to both possibilities. In Gargano, the constable must let the tenant remove his goods, or remove them himself and, because of the different comma placement, it is only if the constable moves the goods himself that he acts as agent of the landlord. It is impossible to say if the changes were intentional. "Must" is certainly different from "had a right to," but commas sometimes move about with less writer awareness.
If a conscientious constable sought guidance from the New Jersey Practice series, he would find that a constable
may give the tenants an opportunity to remove their goods, or he may remove them as agent of the plaintiff.... [18 New Jersey Practice, § 1565 at 300-301 (1971)].
Here, the comma is in the Gargano position but the Gargano "must" has given way to the Bayliss-style "may." The Practice Series continues:
The practice now is for the landlord to place the tenant's goods in storage.... The [constable] usually stands by at the request of the landlord to keep the peace while the goods are removed, but that is not a part of his duty under the warrant. [Id. at 301].
It is hard to say what a conscientious constable, unaided by a committee of linguists and grammarians, should conclude from all this. The only thing that Bayliss, Gargano and the Practice Series agree on is that, if the constable removes the tenant's goods, he does so as agent of the landlord. And none of the authorities say that there is anything wrong with his assuming that role after locking the tenant out.
A constable's statutory responsibility is to perform ministerial duties for the court as provided by rule of the Supreme Court. N.J.S.A. 2A:6-15. The Supreme Court has not undertaken to promulgate rules of court detailing a constable's duties or limiting his conduct. Historically, the office of constable is a shifting and imprecisely defined one. See Callen v. Sherman's, Inc., 92 N.J. 114 (1983); State v. Thyfault, 121 N.J. Super. 487 (Cty.Ct. 1972), aff'd o.b. 126 N.J. Super. 459 (App.Div. 1974); Harriatt v. Lillo, 452 F. Supp. 421 (D.N.J. 1978).
*86 Even in modern times, it is not uncommon for constables, although they are court officers, to act as the agents of private persons. Removing dispossessed tenants' goods is one example already explored. Another is aiding a landlord in a distraint of tenant's goods. Distraint is an ancient common law self-help remedy requiring no judicial intervention. New Jersey's statute recognizes participation of constables in distraint proceedings. N.J.S.A. 2A:33-1 et seq. The process was recently declared unconstitutional. Callen v. Sherman's, Inc., supra. The constable acted in distraint proceedings as agent of the landlord. His role was established by agreement with the landlord, within the limits of the statute, and did not arise out of any court order, rule or procedure.
A similar example was the practice of a constable's repossessing a motor vehicle for an unpaid repair bill pursuant to the Garageman's Lien Law. N.J.S.A. 2A:44-20 et seq. That too is a private self-help remedy created by law and available without judicial process. See State v. Thyfault, supra. But see Associates Commercial Corp. v. Wallia, 211 N.J. Super. 231 (App. Div. 1986) as to the partial unconstitutionality of the statute. Another similar example is the employment of constables to repossess motor vehicles for default in payments due secured lenders. That is a self-help remedy created by contract and recognized by statute and is independent of judicial process.
Here again, the conscientious constable might consult the Practice Series. He would find:
Constables as well as sergeants-at-arms of county district court execute distraints as attorneys-in-fact for landlords and conduct distress sales, repossess on behalf of creditors personal property subject to a security interest and conduct public sales and perform other "self-help" functions on behalf of creditors and their attorneys and collection agencies. These are not court proceedings, are not supervised or reviewed by any court except when a suit arises out of them and are not entered in court records. Some of these services are not required to be done by public officers but could theoretically be done by the creditors or landlords themselves. The constables and sergeants-at-arms (as wells as sheriffs and their deputies) are employed because they learn the procedures which are similar to those used under court process and with which most lawyers are unfamiliar. In addition, they are aided by their official *87 badges and acquaintance with the police in avoiding breaches of the peace and arrests on suspicion of theft or trespass when performing these functions. The practice is a vestige of simpler days. [17 New Jersey Practice Series, § 132 at 52 (1971)].
The point is that historically the office of constable was one without well-recognized boundaries. Some of the activities were constables' responsibilities. Some others were constables' privileges, or opportunities which seemed to grow out of their official standing and knowledge of the mechanics of exercising creditors' remedies.
The opinion testimony in the trial further illustrates the point. The Assignment Judge initially testified in a voir dire hearing that defendant's providing security services while the tenants removed their goods "was part and parcel of the eviction proceedings that Mr. Grimes undertook." Before the jury also, the Judge opined that supervising tenants' moving out is part of the constable's job and thus authorized. If it took six or eight hours, he could charge a maximum of $30, and not $150.
During cross-examination, the testimony changed direction. The witness conceded that the security services afforded by defendant "were not part of the lockout process," that defendant's trip to the premises with the removal warrant, a locksmith and a police officer on February 6 justified payment of $30, and that the February 9 security services were additional. But, the Assignment Judge opined, providing private services was a crime because done without R. 1:17-4 approval, because it constituted a conflict of interest, and because defendant had improperly solicited the business while serving as a public officer.
Another Superior Court judge also testified. He was presiding judge when Assured Services was formed. Another constable, who was to work for the company along with defendant, spoke to the presiding judge about it. He did not say that the business would include providing security services in evictions. If he had, the judge testified, he would not have approved it. He explained why:

*88 The reason for not approving it is that the duties of a Constable are not very clearly defined in terms of exactly what they encompass in their purpose of the District Court Officers. Constables, District Court Officers, a more proper term is to try to carry out Court orders and to be able to be flexible enough to deal with different situations when they arise. Both things happen in kind of a standard way, but they often have to deal with untypical things and use discretion, and so an Officer could be required to do any number of things in connection with a lockout; and therefore, any private employment which they would have in connection with lockouts might conflict with their official duties or even if it didn't actually conflict, then it might give the appearance  would give the appearance of the conflict. By conflict I mean if a person is paid rather modestly, but nevertheless they're paid. When they are District Court Officers to do a lockup, they should receive no other compensation except that which is expressly allowed by the Court.
The judiciary has wrestled in recent years with the long-term unclarity in the nature and scope of the office of constable. An August 11, 1981 AOC memo (# 12-80) announced that the Supreme Court had a "policy" that constables could "arrange with landlords to provide additional services pertaining to an eviction for additional amounts" with limits to be set by the Assignment and Presiding Judges to guard against overcharging. The memo concluded:
[T]he Supreme Court remains opposed to persons employed by the court, even on a part-time basis, being permitted to charge a landlord additional fees other than those set by the legislature for eviction.
The memo does not attempt to say what are "additional services pertaining to an eviction" or what the fees "set by the Legislature for eviction" actually cover.[7]
Pursuant to the memo, Burlington County constables were instructed by the local Presiding Judge that they could charge additional fees to landlords for "providing added services in an eviction" limited to a total of $30. No definitional help was included. The only "additional services" that were mentioned were procuring the attendance of locksmiths and police officers (services which defendant provided Capece and charged $30 *89 for). Supervising removal of tenants' goods on a separate occasion was not mentioned. The focus of the instructions may be revealed, however, in a follow-up memo from a new Presiding Judge in late 1983. He headed his memo, "Additional fees for lockouts" and referred to the 1982 additional fee schedule, which he attached, as providing "extra fees for lockouts" which, he continued, are to be imposed "only in especially time-consuming matters." Services beyond the lockouts themselves remained in undefined limbo.
Our intention is not to resolve all of the imponderables, but only to demonstrate that they are imponderables and that they are unresolved. The office of constable is an historical curiosity. It does not fit comfortably within salutary modern concepts requiring separation of public and private services. The efforts made to modernize and regularize the office are incomplete and not yet successful. The application of R. 1:17-4 has not been a solution. In this opinion, we make no effort to harmonize the conflicting views expressed in prior judicial opinions, in traditionally accepted practices, in a legal reference work and in the testimony produced by the State in this case. A criminal appeal involving the evaluation of past conduct is no place for retroactive innovations in the law.
A public servant is guilty of official misconduct under N.J.S.A. 2C:30-2a only if he knows his act, relating to his office, is unauthorized or committed in an unauthorized manner. Unlike most crimes, as to which ignorance of the law is not material, see N.J.S.A. 2C:2-4, an essential element of this kind of official misconduct is defendant's knowledge that the act he commits is unauthorized. See State v. Stevens, 115 N.J. 289, 305, 308, (1989); Cutter ads. State, 36 N.J.L. 125 (Sup.Ct. 1873); 1 Wharton, Criminal Law, § 163 at 392 (1957).
In order fairly to expose a public officer to prosecution for committing an unauthorized act, there must be an available body of knowledge by which the officer had the chance to regulate his conduct. The law must give a person of ordinary intelligence fair warning what conduct is proscribed, so that he *90 may act accordingly. Cf. State v. Moretti, 52 N.J. 182, 192 (1968); Trade Waste Management Ass'n, Inc. v. Hughey, 780 F.2d 221, 235 (3 Cir.1985).
Here, defendant knowingly acted either as a public officer or as a private person, depending on which version of the State's case the jury preferred. He knowingly overcharged for public work or knowingly solicited inappropriate private work, again depending on which version of the State's case the jury preferred. Ignored in the State's case was the amorphous area of private work which has traditionally fallen to constables, which was recognized by Bayliss, Gargano, Callen and Thyfault and New Jersey Practice without apparent condemnation, and which has not been effectively confronted by recent efforts to modernize the office of constable.
The law of constables' duties in tenant removals is so uncertain that it was presented to the jury as a matter of disputed fact. That degree of uncertainty shows that the law does not, in this area, give a person of ordinary intelligence fair warning what conduct is proscribed. In those circumstances, it is fundamentally unfair to subject defendant to a criminal prosecution.
Reversed and remanded for dismissal of the indictment.
NOTES
[1] Defendant's position was that it was Assured Services, Inc., for which he sometimes worked, that was available to help. Since defendant and another constable were the only Assured Services employees and the stockholders were defendant's wife and the other constable's 17 year old daughter, we consider this to be a quibble and not a consequential difference.
[2] The jury was unaware that, in separate proceedings, the assignment judge had found defendant guilty of impropriety and removed him from the office of constable.
[3] The State did not assert that the witness possessed unique knowledge. He had not presided over, sat in or practiced in the District Court or the Special Civil Part.
[4] The jury charge included "I instruct you that Constables were required, as a matter of law, to charge fees for special or extra eviction services in 1985 in accordance with those [memos]."
[5] Defendant has not argued that this choice was outside of the scope of the indictment whose gist seemed to be overcharging for official services. That was also the original focus of the Assignment Judge's opinion. Because defendant has not made the argument, we will not explore it.
[6] The jury instructions and the court's determination of what was law binding on the jury and what was fact for its determination are not the subject of appeal, except insofar as they are related to the opinion testimony issue, and will not be the subject of further comment.
[7] N.J.S.A. 2A:6-15 contemplates that the Supreme Court's rulemaking power will be employed to define the constables' ministerial duties. Defendant argues that the informal adoption of a "policy" is insufficient to authorize local fee-setting or job limitation. Because of our disposition of the appeal, we need not deal with the argument.