ANDREW B. CALLEN AND DICKSIE H. CALLEN, HIS WIFE, AND RALPH A. RUNYON, JR., AND PATRICIA S. RUNYON, HIS WIFE, T/A PARD REALTY, PLAINTIFFS-APPELLANTS, v. SHERMAN'S, INC., FLORENCE KARASIK, INDIVIDUALLY, AND JULES KARASIK, DEFENDANTS-RESPONDENTS.

Argued October 13, 1982—Decided February 10, 1983.

116

*Leonard S. Needle* argued the cause for appellants (*Zager, Fuchs, Leckstein & Kauff,* attorneys).

*Kathleen R. Wall* argued the cause for respondents (*Sugarman and Wall,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal questions the validity of statutes permitting a landlord to distrain the goods of a commercial tenant for unpaid rent. *N.J.S.A.* 2A:33–1 to –23. Specifically, the appeal presents two issues. The first issue is whether distraint by a municipal constable at the request of a landlord invokes the protection of due process accorded by the fourteenth amendment of the United States Constitution. Implicit in that issue is the further question of whether the acts of the constable are fairly attributable to the state and, therefore, constitute "state action." The second major issue is, if there is state action, whether the statute provides a commercial tenant with sufficient notice and opportunity to be heard to satisfy the constitutional requirement of due process.

The landlord filed a complaint seeking damages for breach of the lease, and the tenant counterclaimed asserting that the

distraint was unconstitutional. Before trial, the court found that the tenant had breached the lease and it granted a partial summary judgment on liability for the landlord. At the commencement of the trial, the issues were the damages due the landlord, the liability of the landlord because of the distraint, and damages, if any, due the tenant. The court impaneled a jury and granted the landlord's motion to dismiss the counterclaim as a matter of law. In reaching that conclusion, the trial court reasoned that the actions of the landlord and constable were not state action and, therefore, that the tenant was not entitled to due process under the fourteenth amendment. With the consent of counsel, the court dismissed the jury and proceeded as the trier of fact to determine the damages due the landlord. At the conclusion of the trial, the court entered a judgment against the tenant for unpaid rent in the amount of $7,418.07.

On appeal, the Appellate Division affirmed the damages award for the landlord, but reversed the dismissal of the tenant's counterclaim and remanded the matter for a new trial on the counterclaim. The court found that the distress constituted state action and that the tenants were not afforded due process.

We granted the landlord's petition for certification to review the Appellate Division's determination of the unconstitutionality of the statutes granting a landlord the right to distrain a commercial tenant's goods for unpaid rent. 89 *N.J.* 443 (1982). Although we conclude that the statutes are unconstitutional as applied in this case, we find further, in light of all the facts, that the tenant suffered no damages because of the distraint. Consequently, we reverse the judgment of the Appellate Division, thereby reinstating the judgment of the trial court dismissing the counterclaim.

I

Plaintiffs are four individuals trading as Pard Realty, a partnership that owns a commercial building in Little Silver,

New Jersey. Pard Realty leased a store in the building to Sherman's, Inc. for an interior decorating retail business. Defendants Florence Karasik and her husband, Jules, principals of Sherman's, guaranteed the lease.

The lease term extended from November 15, 1975 to November 14, 1977, and the total rent was $19,200, payable $800 per month, due in advance on the fifteenth of each month. In the event of a default, the tenant continued to be liable for the monthly rent, but the lease did not provide for the acceleration of the remaining payments. The tenant failed to pay the rent due on October 15, 1976, and in late October or early November advertised with signs at the premises that it was "going out of business." Mr. Callen, on behalf of the landlord, spoke with Mr. Karasik, who said that he could not pay the arrearage and confirmed that he was, in fact, going out of business. On November 12, 1976 the landlord filed its complaint seeking the entire balance due under the lease, $10,400; in fact, however, the actual rent due by November 15 was only $1,600.

After consulting a lawyer, the landlord engaged a municipal constable who distrained the goods in the store by padlocking the premises on December 3, 1976, three weeks after the filing of the complaint. Although the tenant took no action to dissolve the distraint, it notified the United States Small Business Administration (SBA), which held a prior security interest in the personal property and fixtures of the store. The SBA informed the landlord and the constable of its security interest and of the. $123,000 balance due on its loan. Pursuant to the SBA's request, the constable turned over the keys to the premises to a representative of a private auctioneer who, on December 13, conducted a public sale of the tenant's property on behalf of the SBA.

On December 15, 1976, the SBA surrendered possession of the premises to the landlord and paid $133 as rent for the period during which it controlled the store. Nothing indicates that the landlord had any knowledge of the SBA's lien on the property at

the time of the distraint, and neither the SBA nor the constable is a party to the present action. Shortly after regaining possession of the premises, the landlord advertised for a new tenant, but did not lease the premises until September 30, 1977.

Furthermore, counsel have acknowledged that the certificate of incorporation of Sherman's, Inc. was revoked in 1981 for nonpayment of corporate business taxes. Furthermore, in 1980 Mr. and Mrs. Karasik filed a petition in bankruptcy that included the judgment in favor of the landlord as a liability and the equity, "if any," in the counterclaim as an exempt asset. The trustee in bankruptcy abandoned any interest in that claim, and in 1981 the Karasiks received a discharge in bankruptcy, which declared null and void all judgments.

## II

Distraint of a tenant's goods by a landlord may be the sole surviving relic of the early common law's tolerance of self-help. *See Commercial Credit v. Vineis,* 98 *N.J.L.* 376 (Sup.Ct.1923). Nonetheless, since at least the thirteenth century, the common law has condoned distraint as an exception to the principle that "self-help is an enemy of the law, a contempt of the king and his court." 2 Pollock & Maitland, *Hist. of Eng. Law* 574 (Cambridge ed.1968). Other forms of self-help, such as replevin, generally have yielded to the contemporary belief that society is better off if adversaries who cannot otherwise settle their differences proceed before an impartial third party such as a mediator, arbitrator or judge.

At common law a landlord was allowed only to hold property pending the payment of rents or services. Impounded goods— *e.g.,* livestock—were considered to be in the custody of the law. A tenant could not breach the pound and remove the goods, *see* 3 W. Blackstone *Commentaries* *12–13, and the landlord could not sell the goods in satisfaction of the debt. *Elkman v. Rovner,* 133 *N.J.Eq.* 93, 98 (1943). *See* 1 Pollock & Maitland, *supra,* at 353. Later, statutes permitted the landlord to appraise and sell

the goods under official supervision after notice to the tenant. In response to a perceived excess of power in the hands of feudal lords, other statutes were enacted to limit the ability of a lord to distrain. The Statute of Marlebridge, for example, banned unreasonable distraints, gave the tenant the right of replevin and ended distraint for services not due. Bradby, *A Treatise on the Law of Distresses* 8 (1808).

In New Jersey, statutes have provided for distraint since 1795, and the current act, *N.J.S.A.* 2A:33–1 to –23, still exhibits its feudal origins. Although neither the statutes nor the common law has ever specified the form that distraint should take, Bradby, *supra,* at 216–17, padlocking of the tenant's premises has long existed as an accepted method of distraint. *See, e.g., Elkman v. Rovner, supra; Lipinski v. Frank,* 12 *N.J.Misc.* 174 (1934). No notice or hearing is required before distraint, but a distraining party is liable in damages for an "unreasonable, excessive or wrongful distraint...." *N.J.S.A.* 2A:33–1. Thus, in *Lipinski v. Frank, supra,* a distraint was adjudged to be wrongful when the landlord sold for $50 goods worth $450, although the tenant owed only $45 and offered to pay the amount due.

The New Jersey statute further provides for double damages for goods wrongfully distrained and sold, *N.J.S.A.* 2A:33–17, but awards the landlord double costs if the tenant loses in an action for wrongful distraint. *N.J.S.A.* 2A:33–19. The act exempts from distraint residential premises, *N.J.S.A.* 2A:33–1, and other kinds of property. *N.J.S.A.* 2A:33–6. Unlike the early English common law, the New Jersey statute encourages the participation of a government official from beginning to end: "All sheriffs and constables shall aid in the execution of the provisions of this chapter." *N.J.S.A.* 2A:33–14.

Following the distraint, the goods are impounded and the tenant is liable for treble damages for wrongfully removing them. *N.J.S.A.* 2A:33–16. The statute expressly provides for the assistance to the landlord of a constable or peace officer

where the tenant has removed or concealed property subject to distraint. *N.J.S.A.* 2A:33–22.

Once the landlord has effected a distraint on the premises and impounded sufficient goods, the tenant has ten days after receiving notice to commence an action to recover them. Thereafter, on two days' notice, the landlord may have the goods inventoried and appraised by three persons sworn by the county sheriff or local constable. *N.J.S.A.* 2A:33–9. Subsequently, on five days' public notice, the landlord can hold a public sale, *N.J.S.A.* 2A:33–10, the proceeds of which apply toward the satisfaction of rent due and the costs of the distraint and sale. Any surplus money is left with the sheriff or constable for the property owner. The tenant may sue for replevin of distrained goods before sale or later for wrongful distraint and sale. *N.J.S.A.* 2A:33–17. In the absence of such an action, however, the entire procedure may go forward without the involvement of a judge or other impartial third party. The abiding question is whether the statutory distraint procedure comports with fundamental notions of due process under the United States Constitution.

### III

To be subject to scrutiny under the due process clause, state action must result in the deprivation of life, liberty or property. *Paul v. Davis,* 424 *U.S.* 693, 710–11, 96 *S.Ct.* 1155, 1164–65, 47 *L.Ed.*2d 405 (1976); *Montville Tp. v. Block 69, Lot 10,* 74 *N.J.* 1, 8 (1977). Before determining whether the process afforded by the Distress Act meets constitutional standards, the initial question is whether sufficient state action inheres in the distraint by the constable to imperil the constitutional rights of the tenant.

The existence of state action depends "on the relationship between the state and the challenged conduct." *State v. Droutman,* 143 *N.J.Super.* 322, 329–30 (Law Div.1976). An evolving

concept, state action is susceptible only to a fluid definition. *See State v. Schmid,* 84 *N.J.* 535, 552 (discussing state action in the context of first amendment principles as applied to owners of private property). The most recent decision of the United States Supreme Court supports the conclusion that the distraint by the constable resulted in a deprivation by the state. *Lugar v. Edmondson Oil Co.,* —— U.S. ——, 102 *S.Ct.* 2744, 73 *L.Ed.2d* 482 (1982).

*Lugar* involved a Virginia statute allowing creditors to petition the clerk of the court *ex parte* for a writ of attachment against the goods of a debtor. Pursuant to the statutory scheme, the county sheriff executes the writ and a hearing may occur later on the propriety of the attachment. In *Lugar,* after this post-deprivation hearing, the court dismissed the attachment. The debtor then sued the creditor under 42 *U.S.C.* § 1983 claiming a violation of his constitutional rights. The Court found that the creditor's remedies implicated state action: "Beginning with *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 *S.Ct.* 1820, 23 *L.Ed.2d* 349 (1969), the Court has consistently held that constitutional requirements of due process apply to garnishment and prejudgment attachment procedures whenever officers or the state act jointly with a creditor in securing the property in dispute." 102 *S.Ct.* at 2752.

The Court enunciated a two-pronged test for determining whether an action depriving an individual of a constitutional right is "fairly attributable" to the state:

First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible. In *Sniadach, Fuentes, W.T. Grant* and *North Georgia,* for example, a state statute provided the right to garnish or to obtain prejudgment attachment, as well as the procedure by which the rights could be exercised. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official,

because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state.

[*Id.* at 2754.] [1]

■ In the distraint in the present case, the landlord and constable acted pursuant to a right created by statute. Although the right to distrain existed at common law, the landlord relied on its rights under the statute in effectuating the distraint. This governmental involvement is mandated by the requirement that sheriffs and constables, if requested, aid in the execution of a distraint. *N.J.S.A.* 2A:33–14. Under the first part of the *Lugar* test, then, the deprivation was caused by a right created or rule imposed by the state.

Next we must determine whether the landlord, in effectuating the distraint, acted in cooperation with a state official. *Lugar, supra,* 102 *S.Ct.* at 2754. That determination is necessary because the Court has declined to find state action from the mere existence of a body of property law without the involvement of a state official in enforcing that law. *Flagg Bros., Inc. v. Brooks,* 436 *U.S.* 149, 98 *S.Ct.* 1729, 56 *L.Ed.2d* 185 (1978). While some scholars believe that regulatory policy can constitute government action, Tribe, *American Constitutional Law,* § 18–7 (1978), *Flagg Bros.* and *Lugar* require the identification of a state actor. In this case, the constable, who padlocked the store and delivered the keys to the SBA, played that part.[2] By

---

[1]The cases cited by the Court, *Sniadach v. Family Fin. Corp.,* 395 *U.S.* 337, 89 *S.Ct.* 1820, 23 *L.Ed.2d* 349 (1969); *Fuentes v. Shevin,* 407 *U.S.* 67, 92 *S.Ct.* 1983, 32 *L.Ed.2d* 556 (1972); *Mitchell v. W.T. Grant Co.,* 416 *U.S.* 600, 94 *S.Ct.* 1895, 40 *L.Ed.2d* 406 (1974), and *North Georgia Finishing, Inc. v. Di-Chem,* 419 *U.S.* 601, 95 *S.Ct.* 719, 42 *L.Ed.2d* 751 (1975), not only illustrate the test for state action, but, as discussed in Part IV, demonstrate that the New Jersey distraint statute fails to satisfy the requirement for due process.

[2]Constables are appointed by the governing body of the municipality for a three-year term. *N.J.S.A.* 40A:9–120. They are required to swear an oath, *N.J.S.A.* 40A:9–124, and post a bond, *N.J.S.A.* 40A:9–125, before taking office. Courts of this State have held constables to be state officers on a number of occasions. *State v. Thyfault,* 121 *N.J.Super.* 487 (Law Div.1972), aff'd, 126

carrying out his official duties pursuant to a statutory scheme, the constable was a state actor. We conclude that the conduct of the lessor and constable constitutes state action.

That finding, mandated by *Lugar,* is consistent with *King v. South Jersey Nat'l Bank,* 66 *N.J.* 161 (1974). In *King,* we held that no state action was involved in the repossession of an automobile by a creditor without the aid of state officials, pursuant to an agreement between the parties and a provision of the Uniform Commercial Code. *N.J.S.A.* 12A:9–503. As this Court noted in *King,* the Code does not provide expressly for any action by a governmental official in the act of repossession. We found the UCC to be a mere codification of preexisting private rights and "is in effect a passive perpetuation of the common law and as such does not 'significantly' involve the state in the denial of due process rights." *Id.* at 172. Moreover, the statute "permits a creditor to exercise self-help in retaking property in which he possesses a valid security interest. The statute in no way commands the creditor so to do—it simply authorizes. And mere authorization of private conduct does not *ex necessitate* comprise 'state action.'" *Id.* at 180 (Clifford, J., concurring).

The Distress Act does far more than simply permit private action. It authorizes governmental assistance throughout the procedure, *N.J.S.A.* 2A:33–14, and requires governmental assistance in certain circumstances.[3] In the present case, the landlord

---

*N.J.Super.* 459 (App.Div.1974), held that "a person enjoying the official status of 'constable' should be considered a public officer and, in that sense, 'an officer ... of the state or ... political subdivision thereof ....'" 121 *N.J.Super.* at 495. *See In re Burroughs,* 125 *N.J.Super.* 221 (App.Div.1973); *Harriatt v. Lillo,* 452 *F.Supp.* 421 (D.N.J.1978). Furthermore, as observed by the court in *Van Ness Industries Inc. v. Claremont Painting and Decorating Co.,* 129 *N.J.Super.* 507 (Ch.Div.1974) sheriffs are constitutional officers under Art. VII, sec. 2, par. 2 of the New Jersey Constitution, further rendering their participation in distraint procedures state action.

[3] A sheriff or constable who effectuates a distraint after request by a landlord is responsible for swearing in the three appraisers. *N.J.S.A.* 2A:33–

enlisted the aid of the constable from the inception; it was the constable who effectuated the distraint by padlocking the premises. Those facts and the statutory scheme distinguish the present case from the repossession of an automobile by a private party pursuant to the UCC in *King*. *See Van Ness Indus., Inc. v. Claremont Painting & Decorating Co.,* 129 *N.J.Super.* 507, 514 (Ch.Div.1974) (also holding that the distress statute involves state action, distinguishing it from provisions of the UCC).

For similar reasons, *Flagg Bros., Inc., supra,* also is distinguishable. *Flagg Bros.* addressed the constitutionality of the provisions of the UCC pertaining to warehousemen's liens. The Court rejected the claim that state action was involved, reasoning: "[t]his Court ... has never held that a State's mere acquiescence in a private action converts that action into that of the State." *Id.* 436 *U.S.* at 164, 98 *S.Ct.* at 1737.

Furthermore, the New Jersey Distress Act differs significantly from the Pennsylvania statute that the United States Court of Appeals for the Third Circuit, in a decision rendered one month before *Lugar,* found not to give rise to state action. In *Luria Bros. & Co., Inc. v. Allen,* 672 *F.2d* 347 (3d Cir.1982), a private individual distrained pursuant to a statute that did not provide for any participation of state officials. The court wrote: "Such distress may be made by the landlord or by his agent duly authorized thereto in writing." *Pa.Stat.Ann.* tit. 68, § 250.302. *See also Hitchcock v. Allison,* 572 *P.2d* 982 (Okl.1977) (finding no state action where landlords executed statutory lien on tenant's property without the aid of any state officials).

▮ Not all state action results in a deprivation of life, liberty or property. At times, it is a difficult and subtle task to

---

9. Following the sale of the distrained goods, any proceeds that exceed the debt for rent must be left in the hands of a sheriff or constable for return to the tenant. *N.J.S.A.* 2A:33–10. Furthermore, if a tenant secures property to avoid distraint, the landlord may not distrain without first "calling to his assistance a constable or peace officer, who shall aid and assist therein." *N.J.S.A.* 2A:33–22.

determine whether there has been a deprivation sufficient to trigger the procedural protection of the Constitution. *See Meachum v. Fano,* 427 *U.S.* 215, 96 *S.Ct.* 2532, 49 *L.Ed.2d* 451 (1976); *Bishop v. Wood,* 426 *U.S.* 341, 96 *S.Ct.* 2074, 48 *L.Ed.2d* 684 (1976); *Paul v. Davis, supra; Wolff v. McDonnell,* 418 *U.S.* 539, 94 *S.Ct.* 2963, 41 *L.Ed.2d* 935 (1974); *Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145 (1978); 2 Davis, *Administrative Law Treatise,* chap. 11 (1979 and Supp.1982). *Compare Bd. of Regents v. Roth,* 408 *U.S.* 564, 92 *S.Ct.* 2701, 33 *L.Ed.2d* 548 (1972), *with Perry v. Sindermann,* 408 *U.S.* 593, 92 *S.Ct.* 2694, 33 *L.Ed.2d* 570 (1972). Nonetheless, even a temporary deprivation of property can be a "deprivation" under the fourteenth amendment. *Goss v. Lopez,* 419 *U.S.* 565, 576–77, 95 *S.Ct.* 729, 737–38, 42 *L.Ed.2d* 725 (1975); *Fuentes v. Shevin,* 407 *U.S.* 67, 85, 92 *S.Ct.* 1983, 1996, 32 *L.Ed.2d* 556 (1972). The padlocking of one's business premises by a municipal constable, although temporary, qualifies as a deprivation of property under this statement. Not only did the distraint preclude the tenant's control of the goods within the store, but it further denied the tenant access to the property in which it held a leasehold estate. *Hudson Transit Corp. v. Antonucci,* 137 *N.J.L.* 704 (1948). We conclude that the tenant was deprived of property within the meaning of the fourteenth amendment.

## IV

Having concluded that the distraint by the constable pursuant to the statute invokes the defendant's constitutional rights, we must decide what process is due to the tenant. Both this Court and the Supreme Court of the United States have recognized that due process is a flexible concept, not susceptible to a single definition suitable for all situations. *Goss v. Lopez,* 419 *U.S.* at 579, 95 *S.Ct.* at 738; *Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* at 164. Although that flexibility permits an appropriate accommodation of competing interests, it also injects an element of uncertainty into the determination of whether procedures meet constitutional standards. R. Scott,

"Constitutional Regulation of Provisional Credit or Remedies: The Cost of Procedural Due Process," 61 *Va.L.Rev.* 807, 809 (1975). This uncertainty is reflected in the decisions of the United States Supreme Court over the past thirteen years in considering prejudgment statutory remedies of creditors.

The beginning point for analysis is *Sniadach v. Family Fin. Corp.*, 395 *U.S.* 337, 89 *S.Ct.* 1820, 23 *L.Ed.*2d 349 (1969), in which the Court struck down a Wisconsin statute allowing creditors to garnish the wages of debtors through a summons issued by the clerk of the court. The statute required the creditor to notify the debtor of the garnishment within ten days and provided the wage earner with the right to a subsequent judicial hearing. The Court acknowledged that those procedures might meet constitutional standards in extraordinary situations, but on considering that wages are "a specialized type of property presenting distinct problems in our economic system," concluded that a predeprivation hearing must be accorded to a wage earner. Obviously impressed by the hardship lost wages can impose on working people, the Court determined that, absent notice and hearing, prejudgment garnishment violates fundamental principles of due process. *Id.* at 341–42, 89 *S.Ct.* at 1822–23.

Three years later, the Court, in a 4–3 decision, expanded the process that was due debtors in *Fuentes v. Shevin, supra,* striking down Florida and Pennsylvania replevin statutes that allowed for the summary seizure of goods by a state agent upon the *ex parte* application of a creditor and the posting of a security bond in double the value of the property seized. Both statutes allowed the debtor to reclaim possession by posting his own bond within three days of the seizure. Under the Florida statute, the creditor needed to assert only that the debtor was wrongfully detaining the goods and that the creditor was legally entitled to them. The creditor was not required to prove ownership of the goods, but was obliged to prosecute the action against the debtor immediately. Although similar to the Florida scheme, the Pennsylvania statute authorized replevin without requiring the creditor to initiate a prompt court action. Rather,

the debtor was permitted to file a demand that the creditor commence an action within twenty days. Thus, under both statutes, debtors were protected in two ways: first, the statute provided some opportunity for a post-deprivation hearing; second, the creditor was required to post a bond in double the value of the property being replevied. However, the Court found these combined protections to be inadequate.

In holding that a predeprivation hearing was required, Justice Stewart, joined by Justices Douglas, Brennan and Marshall, reasoned:

If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. 'This Court has not ... embraced the general proposition that a wrong may be done if it can be undone.' (citations omitted).

[*Fuentes v. Shevin,* 407 *U.S.* at 81–82, 92 *S.Ct.* at 1994–95.] The Court held further that the posting of a bond was not an adequate substitute for a prior hearing. *Id.* at 83, 92 *S.Ct.* at 1995.

Dissenting on behalf of himself, Chief Justice Burger and Justice Blackmum, Justice White concluded that

much depends on one's perceptions of the practical considerations involved .... I cannot say that the likelihood of a mistaken claim of default is sufficiently real or recurring to justify a broad constitutional requirement that a creditor do more than the typical state law requires and permits him to do.

[*Id.* at 100, 92 S.Ct. at 2004 (White, J., dissenting).]

Two years after its decision in *Fuentes,* the Court upheld a Louisiana statute allowing for prejudgment sequestration upon the buyer's default in paying the balance of the purchase price for household goods. *Mitchell v. W.T. Grant Co.,* 416 *U.S.* 600, 94 *S.Ct.* 1895, 40 *L.Ed.*2d 406 (1974). As with the Florida statute struck down in *Fuentes,* the creditor was required to post a bond and to pursue the matter in court following the sequestration. The statute did not require the creditor to notify the debtor

before seizing the goods, but granted the debtor the right to an immediate post-deprivation hearing seeking dissolution of the writ. Furthermore, the debtor could regain possession of the goods by posting his own bond. Of special importance to the Court was the requirement that, before a writ of sequestration could issue, the creditor file a verified complaint with a judge. The accompanying affidavit must recite specific facts setting forth the nature of the claim, the amount due, and the reason the creditor believed the debtor would dispose of the goods during the pendency of the proceedings.

In the majority opinion, Justice White observed that both the debtor and the creditor had an interest in the goods and that, where only property rights are involved, a post-deprivation hearing can satisfy due process. Justice White undertook to distinguish *Fuentes,* but in a concurring opinion Justice Powell stated that the effect of the majority opinion was to overrule *Fuentes.* Justice Brennan dissented, asserting that the statute was unconstitutional under *Fuentes.* Justice Stewart, joined by Justices Douglas and Marshall, regarded the statute as unconstitutional because it did not provide for notice and hearing. Their dissent stated that the majority had simply rejected the reasoning of the *Fuentes* majority and adopted instead the analysis of the *Fuentes* dissent. Thus, it appeared that, after a life-span of two years, *Fuentes* had expired.

This doubt about the viability of *Fuentes* remained only until the following year, when the Court, again speaking through Justice White, invalidated a Georgia garnishment statute in *North Georgia Finishing, Inc. v. Di-Chem,* 419 *U.S.* 601, 95 *S.Ct.* 719, 42 *L.Ed.2d* 751 (1975). In a concurring opinion, Justice Stewart was gratified to note that his report of the demise of *Fuentes* in his concurring opinion in *Mitchell* "seems to have been greatly exaggerated." 419 *U.S.* at 608, 95 *S.Ct.* at 723.

Like the Louisiana statute found sufficient in *Mitchell,* the deficient Georgia statute in *North Georgia Finishing* required

the creditor to post a bond and file an affidavit to obtain a garnishment. In addition, both statutes permitted the debtor to regain his property by posting his own bond. However, the statutes differed in several respects. First, the Georgia statute did not provide the debtor with the right to an early hearing. Furthermore, the writ could be "issued by a court clerk without notice or opportunity for an early hearing and without participation by a judicial officer." 419 *U.S.* at 606, 95 *S.Ct.* at 722. Under the Georgia statute, moreover, the affidavit "need contain only conclusory allegations," and the affiant need not have personal knowledge of the facts. *Id.* at 607, 95 *S.Ct.* at 722. In a concurring opinion, Justice Powell noted with dissatisfaction the resuscitation of *Fuentes* and said that due process would be satisfied if state law required the posting of an adequate bond, establishment before a neutral officer (not necessarily a judge) of the factual basis for the remedy, and a prompt post-garnishment hearing. Justice Blackmun, joined by Chief Justice Burger, in part, and Justice Rehnquist, dissented, arguing in part that the Georgia system afforded commercial entities all the protection required by due process.

The shifting sands of the Supreme Court decisions demonstrate an inconsistency that has been noted by its members and criticized by scholars.[4] Furthermore, each of the majority opinions has inspired a variety of separate opinions, thereby creating

---

[4]Confusion about the demise of *Fuentes* in *Mitchell, see supra* at 130, is matched by confusion about its resuscitation in *North Georgia Finishing. See* 419 *U.S.* at 609, 95 *S.Ct.* at 723 (Powell, J., concurring). Dissenting, Justice Blackmun wrote: "One gains the impression, particularly from the final paragraph of its opinion, that the Court is endeavoring to say as little as possible in explaining just why the Supreme Court of Georgia is being reversed." *Id.* at 614, 95 *S.Ct.* at 726 (Blackmun, J., dissenting). *See* R. Scott, "Constitutional Regulation of Provisional Creditor Remedies: The Cost of Procedural Due Process," *supra,* and W. Newton, "Procedural Due Process and Prejudgment Creditor Remedies: A Proposal for Reform of the Balancing Test," 34 *Wash. & Lee L.Rev.* 65 (1977) for further criticism of the Court's inconsistency in this area.

an individualized and fragmented body of law.[5]   With respect to creditors' preliminary remedies, the Court has been described as being in "serious disarray."   Friendly, "Some Kind of Hearing," 123 *Univ. of Pa.L.Rev.,* 1263, 1316 n. 244 (1975).   *See* discussion in *Parks v. "Mr. Ford",* 556 *F.*2d 132, 148–50 (3d Cir.1977) (Gibbons, J., concurring).   That result is regrettable because it introduces uncertainty in commercial transactions involving not only commercial entities, as in the present case, but also consumers.   *See* Newton, *supra* note 3.

■   Whatever combination of procedures is necessary to meet minimum notice and hearing requirements under the due process clause, the New Jersey statute cannot survive in its present form.   No notice and hearing need be given to the lessee before distraint.   The tenant is remitted to a subsequent action in replevin for repossession of the goods or for damages suffered because of the excessive distraint.   However, the statute contains a built-in disincentive to pursue an action for excessive distraint: the tenant who unsuccessfully pursues such an action is liable to the landlord for double costs.   In the meantime, moreover, the tenant will have been deprived of the goods and

---

[5]In *Sniadach,* Justice Douglas's majority opinion spoke for seven members of the Court.   Justice Harlan concurred, 395 *U.S.* at 342, 89 *S.Ct.* at 1823, and Justice Black dissented.   *Id.* at 344, 89 *S.Ct.* at 1823.   The majority opinion in *Fuentes v. Shevin* was written by Justice Stewart and joined by Justices Douglas, Brennan and Marshall.   White, J., filed a dissent, joined by Burger, C.J., and Blackmun, J.   407 *U.S.* at 97, 92 *S.Ct.* at 2002.   In *Mitchell,* the disarray mounts.   White, J., delivered the majority opinion, in which Burger, C.J. and Blackmun, Powell and Rehnquist, JJ., joined.   Powell, J., concurred. 416 *U.S.* at 623, 94 *S.Ct.* at 1907.   Stewart, J., dissented, in an opinion joined by Douglas and Marshall, JJ., and joined in part by Brennan, J.   *Id.* at 629, 94 *S.Ct.* at 1910.   Justice Brennan filed his own dissenting statement.   *Id.* at 636, 94 *S.Ct.* at 1914.   The majority opinion in *North Georgia Finishing,* in which Douglas, Brennan, Stewart and Marshall, JJ., joined, was delivered by White, J.   419 *U.S.* at 601, 95 *S.Ct.* at 720.   Justice Powell wrote a separate opinion concurring in the judgment.   *Id.* at 609, 95 *S.Ct.* at 723, and Justice Stewart issued a concurring statement.   *Id.* at 608, 95 *S.Ct.* at 723.   Filing a dissenting opinion was Blackmun, J., joined by Rehnquist, J., and in which Burger, C.J., joined in part.   *Id.* at 614, 620, 95 *S.Ct.* at 726, 729.

their value. Before distraint, the lessor need not prove anything to anyone. That is, the lessor is not required to make any showing, either by specific facts or mere conclusions, of his right to distrain. Hence, no judge, court clerk or other impartial officer reviews the lessor's contentions. The landlord is unrestrained in repossessing goods in which he has no ownership interest. No bond or preliminary showing before a third party protects the lessee from an unwarranted taking. In light of the facts of this case, we find the New Jersey statute to be unconstitutional.[6]

Although we limit our holding to a distraint by a constable or sheriff, we note that distraint by a landlord is its functional equivalent. Insofar as the tenant is concerned, he is deprived of possession of his goods no matter who effects the distraint. Landlords would be well advised not to rely on any assumed difference between distraint performed with or without the aid of a constable.

Although we have not previously addressed the constitutionality of *N.J.S.A.* 2A:33–1, the Chancery Division has held that the distraint statute involved state action and failed to meet the requirements of due process. *Van Ness Indus., Inc., supra; Porter & Ripa v. 200 Madison Ave. Real Estate,* 159 *N.J.Super.* 317 (Ch.Div.1978), aff'd on other grounds, 167 *N.J.Super.* 48 (App.Div.1979). Thus, for over eight years landlords and their attorneys have been on notice that distraint is a doubtful and risky procedure.

---

[6]Our holding is consistent with out-of-state cases striking down similar statutes that permitted distraint of the property of a residential tenant. *See, e.g., Hall v. Garson,* 468 *F.2d* 845 (5th Cir.1972) (invalidating a Texas statute); *Stroemer v. Shevin,* 399 *F.Supp.* 993 (S.D.Fla.1973); *Ragin v. Schwartz,* 393 *F.Supp.* 152 (W.D.Pa.1975); *Adams v. Joseph F. Sanson Investment Co.,* 376 *F.Supp.* 61 (D.Nev.1974); *Shaffer v. Holbrook,* 346 *F.Supp.* 762 (S.D.W.Va. 1972); *Blocker v. Blackburn,* 228 *Ga.* 285, 185 *S.E.2d* 56 (1971). In New Jersey, the relevant statute, *N.J.S.A.* 2A:33–1, was amended in 1971 (*L.*1971, c. 228, § 1) to eliminate distraint against residential tenants.

V

Notwithstanding our finding that the statute is unconstitutional, we still must determine whether it can be read in a manner consistent with the requirements of due process. As we recently stated, "a court may engage in 'judicial surgery' to excise a constitutional defect or engraft a needed meaning." *Right to Choose v. Byrne,* 91 *N.J.* 287, 311 (1982). But whether we should do this "depends on whether the Legislature would have wanted the statute to survive." *United States Chamber of Commerce v. State,* 89 *N.J.* 131, 151–52 (1982); *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75 (1980). When appropriate, courts have added to defective statutes those procedures that would save them from infirmity under the due process clause of the fourteenth amendment. 2A Sutherland, *Statutory Construction* § 45.11 (Supp.1982); *see, e.g., State v. DeSantis,* 65 *N.J.* 462, 473 (1974) (reading into obscenity statute constitutionally mandated notice and warning requirements); *People v. Amor,* 12 *Cal.*3d 20, 114 *Cal.Rptr.* 765, 523 *P.*2d 1173, 1179 (1974) (adding notice and hearing requirements to statute calling for defendants to reimburse for appointed counsel). Additional provisions have been implied also to rescue statutes from being invalidated under other constitutional provisions. *Right to Choose, supra,* 91 *N.J.* at 312 (requiring that state-funded abortions be made available whenever the health of the mother is endangered, to save statute from running afoul of the State Constitution); *Schmoll v. Creecy,* 54 *N.J.* 194, 203 (1969) (amending wrongful death statute to include illegitimate children, keeping statute within the requirements of the equal protection clause). Fairness between the state and an individual finds expression through due process, a concept representing the minimal standards of reason and justice governing that relationship. That sense of fairness cannot be imprisoned in a crystal, but must be allowed to grow with the changing relationships of people to each other and to their government. *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 *U.S.* 123, 162–63, 71 *S.Ct.*

624, 643–44, 95 *L.Ed.* 817 (1951) (Frankfurter, J., concurring); see *Nicoletta v. North Jersey Dist. Water Supply Comm'n,* supra.

We have no doubt that the Legislature would want this statute to survive. As previously stated, the New Jersey distraint statute has remained virtually unchanged for nearly 200 years. However, its longevity illustrates not only that the statute has stood the test of time, but that it may no longer comport with current concepts of due process. Although self-help was favored long ago as a remedy for landowners, *see* 2 Pollock & Maitland, *supra,* at 49–52, times have changed. Underlying modern procedure is the belief that a society is better off if disputes are resolved in a neutral forum. See, *e.g., N.J.S.A.* 2A:18–53 and –56, which require notice to a residential tenant in a summary dispossess action, and *N.J.S.A.* 2A:18–57, which requires the entry of judgment by the county district court before eviction.

■ The problem with the challenged statute lies not in the existence of the remedy it accords the landlord, but with the insufficiency of the notice and hearing it affords the tenant. We believe the Legislature would prefer that we preserve the remedy of distraint as long as it is applied fairly. To cure the constitutional deficiencies of the statute, we need only read it in conjunction with the procedural requirements of *R.* 4:52 pertaining to interlocutory relief.[7]

---

[7]*R.* 4:52–1(a) provides:

Order to Show Cause with Temporary Restraints. On the filing of a complaint seeking injunctive relief, the plaintiff may apply for an order requiring the defendant to show cause why an interlocutory injunction should not be granted pending the disposition of the action. The order to show cause shall not, however, include any temporary restraints against the defendant unless he has either been given notice of the application or consents thereto or it appears from specific facts shown by affidavit or verified complaint that immediate and irreparable damage will probably result to the plaintiff before notice can be served or informally given and a hearing had thereon. If the order to show cause includes temporary

Implicit in *Rule* 4:52 is a dynamic concept of due process, one that requires balancing the interests of the parties in accordance with the circumstances of each case. The rule expressly authorizes an *ex parte* application for a temporary restraining order to prevent immediate and irreparable damage. *R.* 4:52–1(a). Absent those compelling circumstances, notice must be given to a tenant, for example, before issuance of a temporary restraint. Where the court authorizes temporary relief, the tenant has the right to move for dissolution or modification "on 2 days' notice or on such other notice as the court fixes in the order." *Id.* One advantage of a proceeding under *R.* 4:52 is that a neutral third party, a judge, will supervise the distraint, thereby eliminating unwarranted or excessive distraints while adequately protecting the landlord's recourse to the tenant's goods to satisfy a claim for unpaid rent. In most cases, a landlord will have sufficient time to seek judicial approval before distraining a tenant's goods. Therefore, distraint and sale of the goods can proceed as prescribed by the statute, but subject to judicial supervision. Reading the statute in light of *R.* 4:52 does not deprive a lessor of his statutory rights; it merely requires him to proceed with due process. That is, without judicial approval, a lessor simply cannot help himself to a tenant's goods.

In seeking temporary relief, a lessor should proceed under *R.* 4:52 in the Chancery Division by order to show cause, supported by verified complaint or affidavit. Where appropriate, the court may authorize the distraint subject to appropriate terms or grant such other emergent relief as is fair and equitable to the

restraints and was issued without notice to the defendant, provision shall be made therein that the defendant shall have leave to move for the dissolution or modification of the restraint on 2 days' notice or on such other notice as the court fixes in the order. The order may further provide for the continuation of the restraint until the further order of the court and shall be returnable within such time after its entry as the court fixes but not exceeding 20 days after the date of its issuance in the case of a resident defendant or 35 days in the case of a non-resident defendant, unless within such time the court on good cause shown extends the time for a like period or unless the defendant consents to an extension for a longer period.

parties. On the return date of the order to show cause, the court should determine the rights of the parties with respect to the possession and sale of the goods pending final hearing. In some instances, the matter may proceed promptly to final hearing.

■ In the extraordinary case, *e.g.,* where the landlord learns that a tenant is loading his goods onto a truck to avoid a just claim, the landlord still may resort to self-help. The need for relief in these circumstances is so compelling that a landlord need not seek judicial approval before availing himself of the statute. A post-deprivation hearing at the request of the tenant under *N.J.S.A.* 2A:33–9 will satisfy the need for due process. *Fuentes, supra,* 407 *U.S.* at 90–92, 92 *S.Ct.* at 1999–2000. By requiring notice and a pre-deprivation hearing in most cases, but permitting self-help and a post-deprivation hearing in extraordinary cases, we remove the constitutional defect and the statute may survive.

## VI

■ Furthermore, we reject the landlord's contention that the tenant waived its constitutional right to due process. Although constitutional rights may be waived in a commercial context, the waiver must be clear. *Fuentes v. Shevin, supra,* 407 *U.S.* at 95, 92 *S.Ct.* at 2001. Here, the lease merely provided that the landlord could reenter the premises following default by the tenant and that the landlord could pursue "other remedies . . . as may be permitted by law." That provision can hardly be construed as a waiver of the tenant's constitutional rights. The right of reentry does not authorize a landlord to deprive the tenant of the use of his property until the rent is paid.

## VII

We conclude that the distraint by the constable constituted state action entitling the tenant to procedural due process under ■

the United States Constitution. By depriving the tenant of its goods without notice and hearing, the landlord violated the tenant's right to due process. We perceive no useful purpose, however, in remanding the matter for further proceedings. For over a month before the distraint, the tenant had advertised that it was going out of business. At the time of the distraint, the tenant was in default not only under the lease, but also on the loan from the SBA. After the distraint, the tenant took no action to regain possession of the goods or to dissolve the distraint. During the pendency of the proceedings in the courts, the certificate of the corporate tenant has been revoked and the individual guarantors have been discharged in bankruptcy. Under the circumstances, we conclude the appropriate disposition is not to protract the proceedings, but to recognize the reality that the defendants suffered no damage because of the distraint.

That part of the judgment of the Appellate Division that remanded the counterclaim for trial is reversed.

For reversal—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*For affirmance* —None.