46 A.3d 507

MAZDABROOK COMMONS HOMEOWNERS' ASSOCIATION,
PLAINTIFF–APPELLANT, v. WASIM KHAN,
DEFENDANT–RESPONDENT.

Argued October 24, 2011—Decided June 13, 2012.

Wefing, J. (temporarily assigned), filed a dissenting opinion.

484

*Jeffrey S. Mandel* argued the cause for appellant (*PinilisHalpern*, attorneys).

*Dana L. Wefer* argued the cause for respondent (*Donovan Hatem*, attorneys).

*Stephen M. Eisdorfer* argued the cause for amicus curiae Community Associations Institute--New Jersey Chapter (*Hill Wallack*, attorneys; *Michael S. Karpoff*, on the brief).

*Frank Askin* argued the cause for amicus curiae American Civil Liberties Union of New Jersey (*Ronald Chen*, Rutgers Constitu-

tional Litigation Clinic, attorney; *Mr. Askin* and *Mr. Chen,* on the brief).

Chief Justice RABNER delivered the opinion of the Court.

The question in this appeal is whether a homeowners' association can prohibit residents from posting political signs in the windows of their own homes.

Defendant Wasim Khan lives in a planned townhouse community that is managed by plaintiff Mazdabrook Commons, a homeowners' association. In 2005, Khan ran for Parsippany Town Council and posted two signs in support of his candidacy at his private residence—one inside the window of his townhouse and another inside the door. Mazdabrook notified Khan that the signs violated the association's rules and ordered their removal. Mazdabrook's regulations banned all residential signs except "For Sale" signs.

This Court has previously examined when a homeowners' association can restrict the right of its members to post signs. In *Committee For A Better Twin Rivers v. Twin Rivers Homeowners' Ass'n,* 192 *N.J.* 344, 929 *A.2d* 1060 (2007), the Court upheld minor restrictions that permitted homeowners to place signs in their windows and in flower beds adjacent to their homes. By contrast, Mazdabrook has barred virtually all expressional activity. Its near-complete ban on signs forbids homeowners from posting any political signs on their own property.

Political speech in support of one's candidacy for public office is fundamental to a democratic society. It is protected by the State Constitution, which affirmatively guarantees the right of free speech to all citizens. Balancing the minimal interference with Mazdabrook's private property interest against Khan's free speech right to post political signs on his own property, we conclude that the sign policy in question violates the free speech clause of the State Constitution. We therefore affirm the judgment of the Appellate Division.

## I.

Mazdabrook Commons is a planned community of 194 townhomes in Parsippany–Troy Hills. The development is enclosed, but not gated, and has no public through-streets. The Mazdabrook Commons Homeowner's Association, Inc. ("Mazdabrook" or "Association") is a non-profit corporation that manages the development. Each owner of a townhouse in the development is a member of the Association, which elects a Board of Trustees.

The development is a common-interest, interdependent community in which individual owners agree to certain common rules and restrictions for the benefit of the entire group. Some of the regulations are intended to preserve the architectural design of the buildings and maintain a uniform aesthetic appearance.

Unit owners receive various closing documents in connection with the purchase of a townhome: a Public Offering Statement (POS) filed by Mazdabrook Developers in 2000; a Declaration of Covenants and Restrictions (Declaration); and the Association's Rules and Regulations. The POS informs purchasers that they must comply with the restrictions in the Declaration and any Rules and Regulations adopted by the Association. Among other things, all three documents restrict the posting of signs.

The POS states that residential units "are of unique architectural design" and summarizes various restrictions that apply to all unit owners. For example, they may not hang laundry outside, install unshielded floodlights, use exterior loudspeakers, place trailers or boats in common areas, or maintain a dog pen outside. Relevant to this case, section 12(k) of the POS states that

[n]o signs are permitted on the exterior or interior of any Unit, except for one "For Sale" sign on the interior of a Unit. Further, the Sponsor shall have the right to place "For Sale" or "For Rent" signs on unsold or unoccupied Units.

The Declaration is attached to the POS. It details a number of restrictions that are binding on the entire development. With regard to signs, prospective owners are not barred from placing signs in their units but are instructed they may only post signs with the prior written consent of the Board:

> No signs (other than those of Sponsor) ... shall be erected or installed in or upon any Building, the Common Facilities or any part thereof without the prior written consent of the Board.

No written guidelines exist to direct the Board's discretion in this area.

The Rules and Regulations, attached to the Declaration, echo its language:

> No signs of any kind will be placed in or on windows, doors, terraces, facades or other exterior surfaces of the buildings or Common Facilities except as provided in the Declaration of Covenants and Restrictions.

At a bench trial in this matter, the Association's president testified that "[t]here are no signs permitted, other than a For Sale sign that can only be placed in a window. The reason being, it's hard enough overseeing the whole development, so we have to not allow any speech as opposed to picking and choosing which sign is okay. . . ."

Khan bought a home in Mazdabrook in 2003. He received and reviewed the POS, Declaration, and Rules and Regulations when he purchased his unit. In 2005, he ran for Parsippany Town Council. He posted two signs in support of his candidacy—one inside his front window and the other inside his front door—so that they would be visible through the glass. Khan testified that he assumed the signs were permissible because he had noticed a political sign supporting his adversaries on the development's model property.

A few days after posting the signs, Khan received a letter from the Board, which stated that a political sign was displayed in his window and ordered its immediate removal. The letter cited to the prohibition on signs in the Declaration and assessed a $25 fine for violating that policy. Khan complied and removed the signs.

We briefly review a second dispute between Khan and Mazdabrook, which is not central to this appeal. In 2006, the Board requested that Khan remove a rose vine growing in front of his home. The Board's request triggered a lengthy dispute between Khan and the Board about the presence and height of the rose vine. The dispute continued until November 2008, when the

Association filed suit against Khan and sought unpaid maintenance fees, fines relating to the rose vine, interest, and late fees. Khan filed an answer and counterclaim against the Association and claimed breach of contract, breach of the implied duty of good faith and fair dealing, and violations of his free speech rights under the New Jersey and Federal Constitutions.

A bench trial was held on June 16 and June 17, 2009, and the vast majority of the testimony related to the dispute over Khan's rose vine. The trial court issued its decision the following day. With regard to the rose vine, the court found in favor of the Association and ordered Khan to pay fines, missed maintenance fees, and late fees. The court reduced the interest rate for the unpaid maintenance fee from twenty to ten percent, and entered an overall judgment of $3,500 for the Association.

As to Khan's counterclaims, the trial court found no free speech violation and dismissed both counts. The court relied on *Twin Rivers* and applied the three-factor test outlined in *State v. Schmid*, 84 *N.J.* 535, 563, 423 *A.*2d 615 (1980), *appeal dismissed sub nom. Princeton Univ. v. Schmid*, 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982), to the Association's sign restriction. The court found that (1) the primary use of the property was residential, (2) the Association had not invited the public to use the property, and (3) fairness considerations weighed in favor of the restriction and against Khan's expressional activity.

Khan appealed, and the Association cross-appealed on the amount of the fine and the court's use of a reduced interest rate. In an unpublished opinion, a divided panel of the Appellate Division reversed in part. All three members of the panel vacated the award related to the rose vine. They also reversed the reduction of the interest charged because the twenty-percent rate constituted a reasonable liquidated damages provision under the Association's by-laws in lieu of an assessment of counsel fees.

The panel then addressed Khan's free speech claims. Like the trial court, all three members resolved the first two prongs of the *Schmid* test in favor of the Association. The panel divided in its

analysis of the third prong. The majority analyzed the fairness of the sign restrictions in relation to Khan's free speech rights and found that the restrictions were not content-neutral, favored commercial speech, and "foreclose[d] an entire type of communication that has long been recognized as significant." After weighing the relevant factors, the majority concluded that the Association's sign restrictions were unconstitutional.

The dissenting judge disagreed with the majority's analysis of *Schmid*'s third prong. The dissent concluded that residents of Mazdabrook agree to a variety of restrictions to preserve the unique architectural design of the buildings and maintain a uniform aesthetic look throughout the development. The dissent compared the facts of this case to *Twin Rivers*—which did not find a constitutional violation—and reasoned that the mutual benefit enjoyed by residents of Mazdabrook outweighed Khan's expressional rights. In addition, the dissent did not believe that *State v. DeAngelo*, 197 *N.J.* 478, 963 *A.*2d 1200 (2009), which invalidated a content-based municipal ordinance, applied to this case. Instead, the dissent considered the sign restriction a servitude that ran with land but did not unreasonably burden Khan's freedom of speech. Finally, the dissent found that defendant had waived his constitutional right to post signs in his windows.

The Association appealed as of right, under *Rule* 2:2–1(a)(2), limited to the issues raised by the dissent. We granted the motions of the American Civil Liberties Union of New Jersey (ACLU) and the Community Associations Institute–New Jersey Chapter (CAI) to participate as amicus curiae.

After oral argument, we requested additional briefing from the parties to address the first prong in *Schmid, supra,*—which requires consideration of the "nature, purposes, and primary use of ... private property," 84 *N.J.* at 563, 423 *A.*2d 615—from the perspective of Khan's ownership interest in his townhouse.

## II.

Plaintiff Mazdabrook argues that a private residential community does not violate free speech rights by enforcing a rule agreed to

by all unit owners, which permits them to display only "For Sale" signs. The Association contends that the Appellate Division erred by concluding that Khan's free speech rights outweigh Mazdabrook's concerns regarding the use of the condominium property.

Mazdabrook presents a number of arguments including the following: that the facts of this case compare favorably to *Twin Rivers,* which upheld similar restrictions; that the restrictions fairly reflect the concerns of a common-interest community in architectural and aesthetic uniformity; that the limits imposed are reasonable time, place, and manner restrictions that afford Khan alternative avenues of expression; and that Khan could have sought permission from the Board to post the signs.

Defendant Khan urges this Court to uphold the Appellate Division. He contends that a restriction prohibiting all but "For Sale" signs is not content-neutral and fails the *Schmid* test. He maintains that the challenged restriction cannot prevail for several reasons: it prevents homeowners from exercising their expressional rights on their own property and not just in common areas; no comparable, alternative channels of communication exist; and the Association's interest in architectural uniformity is minor when weighed against a homeowner's right to free speech. Defendant adds that the restriction cannot be considered a valid covenant because it is unreasonable. Finally, he argues that he did not knowingly waive his right to free speech.

The ACLU, represented by the Constitutional Litigation Clinic of Rutgers Law School, argues that the Association's sign regulations unconstitutionally restrict free speech. A restriction banning an entire category of political speech, the ACLU contends, is unreasonable and therefore unconstitutional. The ACLU notes that lawn signs are an important and inexpensive means of communication, that Khan had no equally effective, alternative way to reach his neighbors, and that it is his right to choose not only his message but the manner in which it is conveyed. Among other arguments, the ACLU also submits that the covenant of good faith and fair dealing implied in Khan's contract with the

Association prevents the Association from defeating Khan's justified expectations in his free speech rights.

CAI urges this Court to uphold the sign restriction. The group raises various arguments: that the Appellate Division misapplied the *Schmid* test; that the test's third prong should not be reached if a property is primarily residential and the public is not invited onto it; that the majority's decision would require the Association to allow public access for competing political messages and would eliminate a private property owner's right to restrict speech on his property; and that the right of association members to express themselves stems not from the State Constitution but from statutory and contract provisions, as well as the fiduciary duty owed by an association's trustees to its members. Finally, CAI maintains that an association must have the authority to regulate the exterior appearance of its buildings.

### III.

New Jersey's Constitution guarantees individuals a broad, affirmative right to free speech. Under the Constitution, "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." *N.J. Const.* art. I, ¶ 6.

That provision has been described as "broader than practically all others in the nation." *Green Party v. Hartz Mountain Indus., Inc.*, 164 *N.J.* 127, 145, 752 *A.*2d 315 (2000). The affirmative guarantee in the first sentence offers greater protection than the First Amendment, which bars the government from restraining speech. *See U.S. Const.* amend. I ("Congress shall make no law ... abridging the freedom of speech ...."); *see also Prune-Yard Shopping Ctr. v. Robins*, 447 *U.S.* 74, 81, 100 *S.Ct.* 2035, 2040, 64 *L.Ed.*2d 741, 752 (1980) (noting states may adopt more expansive protections "than those conferred by the Federal Constitution" (citation omitted)).

■ Federal case law requires some form of "state action" to trigger the protections of the First Amendment. *See Twin Rivers, supra,* 192 *N.J.* at 356, 929 *A.*2d 1060 (citation omitted); *see also Schmid, supra,* 84 *N.J.* at 544–53, 423 *A.*2d 615 (discussing various tests for state action). State law, interpreting a broader constitutional right, does not. *Schmid, supra,* 84 *N.J.* at 559–60, 423 *A.*2d 615. In New Jersey, an individual's affirmative right to speak freely "is protected not only from abridgement by government, but also from unreasonably restrictive and oppressive conduct by private entities" in certain situations. *N.J. Coalition Against War in the Middle East v. J.M.B. Realty Corp.,* 138 *N.J.* 326, 353, 650 *A.*2d 757 (1994) (citing *Schmid, supra,* 84 *N.J.* at 560, 423 *A.*2d 615). As this Court explained in *Schmid,* the free speech and assembly[1] clauses in the New Jersey Constitution can be invoked against private entities "because of the public use of their property." *Schmid, supra,* 84 *N.J.* at 560, 423 *A.*2d 615.

As a result, this Court has previously found that a private university and privately owned shopping malls assumed a constitutional obligation to protect free expression on their premises. *Id.* at 569, 423 *A.*2d 615; *Coalition, supra,* 138 *N.J.* at 362, 365, 650 *A.*2d 757. At the core of those cases, the Court balanced the legitimate interests of private property owners—to be free "from untoward interference with or confiscatory restrictions upon" the reasonable use of their property—and the individual right to free speech and assembly. *Schmid, supra,* 84 *N.J.* at 560–61, 423 *A.*2d 615 (citations omitted). The Court considered the reasonableness of restrictions imposed on speech and assembly in light of those competing interests.

The Court refined an analytical approach to this area in a series of important cases. The seminal *Schmid* case addressed free speech rights on a private college campus. In *Schmid,* the defendant entered the main campus of Princeton University to distribute political materials relating to a Newark mayoral cam-

---

[1] *See N.J. Const.* art. I, ¶ 18.

paign and the United States Labor Party. *Schmid, supra,* 84 *N.J.* at 538–39, 423 *A.*2d 615. Schmid was not a student at the University and did not get advance permission to hand out literature on campus, which University regulations then required for all off-campus groups. *Id.* at 539, 423 *A.*2d 615. Schmid was arrested and convicted of trespass. *Id.* at 541, 423 *A.*2d 615. On appeal, the Court examined the protections a private university owes to outside individuals who seek to speak on campus.

*Schmid* outlined a three-part test to determine the parameters of free speech rights on privately owned property. Under the test, courts must consider

(1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.

[*Id.* at 563, 423 *A.*2d 615.]

The test was designed "to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly." *Ibid.*

Applying the test to Schmid, the Court found that (1) the primary use of the University campus was for education, (2) "a public presence within Princeton University [was] entirely consonant with the University's expressed educational mission," and (3) Schmid's expressional activity was in keeping with the public and private uses of the campus. *Id.* at 564–65, 423 *A.*2d 615.

The Court acknowledged that owners of private property could "fashion reasonable rules to control" expressional rights on their property. *Id.* at 563, 423 *A.*2d 615. The reasonableness of those rules would depend on whether "convenient and feasible alternative means" to free expression existed, *ibid.,* and whether the challenged restriction was subject to standards that protected the legitimate interests of the parties, *id.* at 567, 423 *A.*2d 615. Because the University at the time had adopted no standards to regulate when to grant or withhold permission to off-campus groups, or what type of time, place, or manner restrictions would

apply to individuals seeking to exercise free speech rights, the Court concluded that Schmid's State constitutional right of expression had been violated. *Ibid.*

More than a decade later, the Court applied *Schmid* to require regional shopping centers to permit leafletting on political and societal issues, subject to reasonable restrictions. *See Coalition, supra,* 138 *N.J.* at 344, 650 *A.*2d 757. The plaintiffs in *Coalition* sought to distribute leaflets that opposed United States military intervention in the Persian Gulf; they planned to do so at ten very large shopping centers after the Iraqi invasion of Kuwait. *Id.* at 335–36, 650 *A.*2d 757. Most of the malls denied access entirely; others required the leafletters to obtain liability insurance—which they could not get—before allowing them to use community booths at the mall. *Id.* at 337, 650 *A.*2d 757.

The Court applied the *Schmid* test and found that all three factors favored plaintiffs' expressional rights over defendants' private property interests: (1) the "normal use" of the malls was "all-embracing ... encompassing practically all aspects of a downtown business district"; (2) the public's invitation to use the property was broad; and (3) the free speech sought was "wholly consonant" with the use of the malls. *Id.* at 333–34, 365, 650 *A.*2d 757.

The Court relied not only on *Schmid*'s three-prong test but also decided the case on the basis of a "general balancing of expressional rights and private property rights." *Id.* at 362, 650 *A.*2d 757. It explained that *Schmid*'s standard and elements "are specifically designed with that balancing in mind." *Ibid.* Balancing the private property owners' interest in controlling activities on their property against the limited and important free speech right sought, the Court found that plaintiffs' expressional rights prevailed. *Id.* at 363, 365, 650 *A.*2d 757.

The Court expanded on the nature of the general balancing test in *Green Party,* when it struck certain restrictions that applied to individuals seeking to distribute political fliers and gather signatures for a candidate for public office in a shopping mall. "The

more important the constitutional right sought to be exercised," the Court explained, "the greater the mall's need must be to justify interference with the exercise of that right." *Green Party, supra,* 164 *N.J.* at 149, 752 *A.*2d 315 (citation omitted).

As in *Schmid,* the Court in *Coalition* and *Green Party* recognized that shopping centers could adopt reasonable time, place, and manner restrictions to regulate leafletting and ensure that it did not interfere with the malls' business. *Coalition, supra,* 138 *N.J.* at 362, 377, 650 *A.*2d 757; *see also Green Party, supra,* 164 *N.J.* at 149–50, 752 *A.*2d 315.

Both sides rely heavily on this Court's more recent decision in *Twin Rivers,* which addressed facts similar to the ones now before us: the free speech rights of homeowners who live in a large, planned, residential community managed by a homeowners' association. A group of residents there had formed a committee to try to change how the Twin Rivers association governed the development. *Twin Rivers, supra,* 192 *N.J.* at 351, 929 *A.*2d 1060. The group filed a complaint against the association that sought to invalidate its sign policy. *Ibid.* That policy, which existed to "avoid the clutter of signs" and "preserve the aesthetic value of the common areas," limited residents to posting one sign in any window of their home and a second sign in a flower bed no further than three feet from the residence. *Ibid.* Less relevant to this case, the complaint also challenged rules about access to the community room and the association's monthly newspaper. *Id.* at 352–53, 929 *A.*2d 1060.

The *Twin Rivers* Court applied the tests outlined in *Schmid* and *Coalition.* As to the first *Schmid* factor, the Court emphasized that Twin Rivers was a common-interest community and that the primary use of the property was residential and served private purposes. *Id.* at 365–66, 929 *A.*2d 1060. Second, even though Twin Rivers was accessible to public traffic, the association "ha[d] not invited the public to use its property." *Id.* at 366, 929 *A.*2d 1060. Both factors thus weighed in favor of the association's private property rights. *See ibid.*

Turning to the third factor, the Court "look[ed] to the fairness of the restrictions imposed . . . in relation to plaintiffs' free speech rights." *Id.* at 366–67, 929 *A.*2d 1060. It found that Twin Rivers' private property interest was stronger than the interests asserted in *Schmid* or *Coalition*; unlike those private forums, Twin Rivers had not invited the public onto its property. *Id.* at 367, 650 *A.*2d 757. Also, the association's sign restrictions were relatively "minor"; they limited the number and placement of signs but permitted expressional activities. *Ibid.* On balance, the Court found that the restrictions were not unreasonable and did not violate the State Constitution. *Id.* at 368, 650 *A.*2d 757.

The Court's opinion foreshadowed two important points. First, although it applied the familiar framework from *Schmid* and *Coalition*, it noted that the "case present[ed] an additional complication" because it involved restrictions on both association property and homeowner properties. *Id.* at 365, 650 *A.*2d 757. "[A]t least in regard to the signs on the property of the homeowners," the Court underscored, "it is the private homeowner's property and not that of the Association that is impacted." *Id.* at 367, 650 *A.*2d 757.

Second, the Court in *Twin Rivers* stressed that the association in fact permitted speech "with some minor restrictions." *Ibid.* "Our holding does not suggest, however, that residents of a homeowners' association may never successfully seek constitutional redress against a governing association that unreasonably infringes their free speech rights." *Id.* at 368–69, 929 *A.*2d 1060.

## IV.

### A.

The case law thus tells us how to assess restrictions that an owner of private property, used by the public, may impose on a visitor's free speech rights: by applying *Schmid*'s three-prong test as well as the more general balancing test outlined in *Coalition*. But, as *Twin Rivers* recognized, that framework was not designed

for situations when the person seeking to exercise the right to free speech is not an outsider but a property owner as well—with both free speech and property rights.

If the speaker is both an association member and an owner, the application of the first two *Schmid* factors can vary depending on whether they are viewed from the perspective of the homeowners' association or the homeowner. That ambiguity, in turn, enhances the weight of the third *Schmid* factor—the purpose of the free speech in relation to the uses of the property—contrary to the arguments of amicus CAI. The situation also elevates the importance of the general balancing test, which allows for thoughtful consideration of all of the relevant interests.

### B.

Applying the test helps demonstrate those concerns. The first two *Schmid* factors—viewed through the lens of the Association—support reasonable restrictions on free speech by a homeowners' association. First, Mazdabrook, like Twin Rivers, is a common-interest community. The nature of the property "is distinguishable from any other form of real property ownership because 'there is a commonality of interest, an interdependence directly tied to the use, enjoyment, and ownership of property.'" *Twin Rivers, supra,* 192 *N.J.* at 365, 929 *A.*2d 1060 (quoting *Fox v. Kings Grant Maint. Ass'n,* 167 *N.J.* 208, 222, 770 *A.*2d 707 (2001)). Within that context, owners accede to certain common restrictions for the overall benefit of the development. The primary or "normal" use of their properties is residential.

Second, Mazdabrook has not invited the public to use its property. Although the public is not excluded from its through streets, there is no broad invitation to the public to travel or shop in the Mazdabrook development. *See Twin Rivers, supra,* 192 *N.J.* at 366, 929 *A.*2d 1060.

That said, Khan is not an outsider or visitor like a leafletter visiting a university campus or a shopping mall. He owns the private property where he wishes to speak. Viewed from his

perspective, the primary use of the property—in this case, the townhouse—is still residential. But it is Khan's residence. Also, the extent of the public's invitation to use the property becomes less relevant when viewed through Khan's eyes because he is the property's owner and not an invited guest. From the perspective of the homeowner, the first two *Schmid* factors do not favor near-absolute limits on placing a political sign inside one's own home.

## C.

We therefore turn to the important third factor—the purpose of the expressional activity on the property in relation to its private and public use. We begin by examining the purpose of the speech in question.

Here, the Association restricted political speech, which lies "at the core" of our constitutional free speech protections. *See In re Att'y Gen.'s "Directive on Exit Polling: Media & Non-Partisan Pub. Interest Grps."*, 200 *N.J.* 283, 311, 981 *A.*2d 64 (2009) (quoting *Morse v. Frederick*, 551 *U.S.* 393, 403, 127 *S.Ct.* 2618, 2626, 168 *L.Ed.*2d 290, 300 (2007)). The First Amendment protects speech about the state itself—those who govern, how they govern, and who might govern better. "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates ... and all ... matters relating to political processes." *Mills v. Alabama*, 384 *U.S.* 214, 218–19, 86 *S.Ct.* 1434, 1437, 16 *L.Ed.*2d 484, 488 (1966).

Free speech protections assume particular importance in the context of a person campaigning for public office. "The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates." *Buckley v. Valeo*, 424 *U.S.* 1, 52, 96 *S.Ct.* 612, 651, 46 *L.Ed.*2d 659, 707 (1976).

In this case, the Association's restriction prevented Khan from advancing his own candidacy for Town Council by posting signs at his residence. As the United States Supreme Court has recognized, "residential signs have long been an important and distinct medium of expression"—"a venerable means of communication that is both unique and important." *City of Ladue v. Gilleo*, 512 *U.S.* 43, 54–55, 114 *S.Ct.* 2038, 2045, 129 *L.Ed.*2d 36, 47 (1994).[2] In addition to "play[ing] an important part in political campaigns," the Court noted that "[r]esidential signs are an unusually cheap and convenient form of communication." *Id.* at 55, 57, 114 *S.Ct.* at 2045–46, 129 *L.Ed.*2d at 47–48.

Residential signs are important for another reason as well: "[p]recisely because of their location," they connect the message directly to the speaker and thus add to the words on display. *Id.* at 56, 114 *S.Ct.* at 2046, 129 *L.Ed.*2d at 48. Here, Khan's neighbors and other passers-by would have been able to evaluate the content of Khan's signs as well as their source.

The third *Schmid* factor also requires that the purpose of the restricted speech be considered in relation to the private and public use of the property. Once again, that raises the dual nature of the private property in this case. On one hand, we evaluate the expressional activity in light of the overall Mazdabrook development—a private, residential community whose members agreed to abide by common rules and regulations when they purchased their units. The reciprocal nature of those rules benefits the entire community. *See Twin Rivers, supra,* 192 *N.J.* at 367, 929 *A.*2d 1060. The Association's regulations can help preserve the architectural design of the units, promote a uniform, aesthetic look, and maintain property values, which are all legitimate interests.

---

[2] In *Ladue,* the Supreme Court found that a municipal ordinance that banned most residential signs violated a resident's right to free speech. *Id.* at 58, 114 *S.Ct.* at 2047, 129 *L.Ed.*2d at 49. We do not apply the case's legal framework to restrictions imposed by a homeowners' association, but *Ladue*'s observations about the importance of residential signs in our nation's history are relevant.

At the same time, the proposed speech should be considered in relation to Khan's use of his own private property, not common property of the Association. He, too, possesses legitimate property rights, and he claims a right to free expression on his own property.

A near-complete ban on residential signs, which bars all political signs, cannot be considered a minor restriction as to Khan. For him, it hampers the most basic right to speak about the political process and his own candidacy for office. And "[t]he more important the constitutional right ..., the greater the ... need must be to justify interference with the exercise of that right." *Green Party, supra,* 164 *N.J.* at 149, 752 *A.*2d 315 (citation omitted).

Yet, here, there is only minimal interference with the Association's property or common areas. Khan did not erect a billboard, put up a soapbox, or use a loudspeaker. He posted two signs in the window and door of his home, which people passing by could choose to view or ignore.

Political signs advancing a resident's candidacy are not by their nature incompatible with a private development. They do not conflict with the purpose of the development—unlike signs that might encourage shoppers to leave a mall and shop elsewhere. *See Coalition, supra,* 138 *N.J.* at 375, 650 *A.*2d 757. Rather, signs that support or discuss our political leaders and candidates for office are a small but important part of the fabric of our society. As part of that important debate, a window sign in support of a candidate is a relatively minor interference with private property. *See id.* at 371, 650 *A.*2d 757.

The Association, of course, had the power to adopt reasonable time, place, and manner restrictions to serve the community's interests. *See id.* at 362, 377, 650 *A.*2d 757; *Schmid, supra,* 84 *N.J.* at 563, 423 *A.*2d 615. The homeowners' association in *Twin Rivers* accomplished that by limiting the number and location of residential signs. *See Twin Rivers, supra,* 192 *N.J.* at 367–68, 929 *A.*2d 1060. Reasonable limits could also be placed on the size of

signs. The Association here instead imposed a total ban, with the exception of "For Sale" signs.

The Declaration of Covenants and Restrictions did contain a catch-all exception. It barred owners from installing signs "without the prior written consent of the Board." But the Board adopted no written criteria to guide its unfettered discretion, and there are no standards to regulate when the Board should deny or grant a homeowner's request to post a sign. The restrictions in *Schmid* suffered from the same type of flaw. *See Schmid, supra,* 84 *N.J.* at 567, 423 *A.*2d 615. Reasonable restrictions should be clearly written in advance and made known to the relevant community.

We do not suggest, however, that the Association could properly distinguish among different types of political signs should it adopt a different sign policy.[3] The Association's president acknowledged that problem when he testified that Mazdabrook did not want to pick and choose which signs were acceptable.

In assessing the reasonableness of a restriction, courts also consider whether convenient, feasible, alternative means exist for individuals "to engage in substantially the same expressional activity." *Twin Rivers, supra,* 192 *N.J.* at 358–59, 929 *A.*2d 1060 (quoting *Schmid, supra,* 84 *N.J.* at 563, 423 *A.*2d 615). Mazdabrook suggests that Khan had ample alternatives to posting a sign at his townhouse: he could walk door-to-door, distribute pamphlets, prepare mass mailings, stop and speak to neighbors on the street, speak to them before or after Association meetings, and telephone them. Those options, though, are not substitutes for a more enduring message, identified with the speaker, in the form of a political sign in the window of the speaker's home. The available alternatives cannot replace the "venerable," "unique," and

---

[3] We leave open the possibility, as the United States Supreme Court did in *Ladue,* that a town or homeowners' association may elect to prohibit residents from posting political signs in exchange for a fee. *See Ladue, supra,* 512 *U.S.* at 59 n.17, 114 *S.Ct.* at 2047 n.17, 129 *L.Ed.*2d at 49 n.17.

"important" role that inexpensive, convenient residential signs play—particularly in connection with a political campaign. *Ladue, supra,* 512 *U.S.* at 54–57, 114 *S.Ct.* at 2045–46, 129 *L.Ed.*2d at 47–48.

In a different context—evaluating a municipal ordinance that regulated signs in a residential neighborhood—this Court observed that "[a]dequate alternative means of political communication are not available to owners who are precluded from putting signs and posters in their yards." *State v. Miller,* 83 *N.J.* 402, 413, 416 *A.*2d 821 (1980). *Ladue* likewise casts doubt on Mazdabrook's claim that adequate alternative channels of communication existed. *See Ladue, supra,* 512 *U.S.* at 56, 114 *S.Ct.* at 2046, 129 *L.Ed.*2d at 48. For similar reasons, we are not persuaded that Khan's alternatives were adequate substitutes for the restriction imposed on his free speech.

### D.

The three prongs of the *Schmid* test highlight the Association's legitimate interest in maintaining the architectural design and aesthetic appeal of its common-interest community. The test also emphasizes the fundamentally important right to expression that Khan sought to exercise. On balance, the importance of Khan's right to promote his candidacy for office, and the relatively minor interference his conduct posed to private property, outweighs the interests Mazdabrook asserts here. *See Coalition, supra,* 138 *N.J.* at 371, 650 *A.*2d 757. We find that the Association's sign policy, which prevented Khan from posting a political sign on his home, violates the State Constitution's guarantee of free speech.

We reach the same outcome under *Coalition*'s balancing test. A more general balancing of expressional rights and private property rights offers one advantage here because that test does not pit one person's property rights against another person's right to free speech. Instead, it allows for consideration of three relevant interests: the Association's property interest in managing a private development; Khan's property rights in his own unit;

and Khan's free speech rights in his home. The same factors discussed above fit more easily within the flexible balancing test and lead to the same result: that the free speech right Khan sought to exercise—from his own home—is not outweighed by the Association's property interests.[4]

### E.

At oral argument, the Association maintained that "For Sale" signs were in fact not permitted and that the sign restriction was content-neutral.[5] Even if we accepted that position, the outcome would be no different. Our conclusion that Khan's expressional activities were unreasonably and unconstitutionally restricted does not rest on a finding of content-based discrimination. This case is not about whether the Association's policy favored commercial speech over political speech. If that were the question, a home-owners' association, in theory, could repeal a content-based ex-

---

[4] The dissenting opinion suggests that the above analysis is not necessary because the record is inadequate and the parties did not explore alternative theories like selective enforcement. *Post* at 508–09, 46 *A.3d* at 522–23. Although the record is concise, it is direct: Khan alleged that he was fined for having a political sign in his window in violation of his constitutional right to free speech. The Association disputed that claim, and both sides presented evidence and argument on the issue. Khan did not claim that Mazdabrook selectively enforced its rules against him, and Mazdabrook had no reason to defend against an issue the dissent now raises.

To resolve the dispute that the parties framed and presented, we have no choice but to reach the constitutional question before us. *See Randolph Town Ctr., L.P. v. Cnty. of Morris*, 186 *N.J.* 78, 80, 891 *A.2d* 1202 (2006) ("Courts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation." (citations omitted)). The Appellate Division panel did likewise, and its differing views on the constitutional issue generated this appeal of right. *See R.* 2:2–1(a)(2).

[5] In advancing that argument, the Association looked beyond the POS—which specifically allows unit owners to place "For Sale" signs on the interior of a unit—and pointed to the Declaration, which bans all signs not previously approved by the Board. This new assertion contradicts the Association's earlier position. At trial, the Association's president testified that a "For Sale" sign in the window was allowed.

emption—that is, it could ban "For Sale" signs as well—to rescue a policy banning all signs. That solution would fail because our analysis faults the Association for prohibiting *too much* speech. *See Ladue, supra,* 512 *U.S.* at 53, 114 *S.Ct.* at 2044, 129 *L.Ed.*2d at 46.

## V.

■ Finally, at oral argument, the Association claimed that Khan waived his constitutional right to free speech because he bought his unit with full knowledge of the sign restrictions listed in the offering and governing documents. The Association did not argue waiver in its brief before the Appellate Division and made only a passing reference in the brief it submitted to this Court. The dissenting judge in the Appellate Division concluded that Khan had waived his free speech rights. We do not agree.

■ Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938). Although rights may be waived, courts "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Ibid.* (internal quotation omitted). To be valid, waivers must be knowing, intelligent, and voluntary. *See Faretta v. California,* 422 *U.S.* 806, 835, 95 *S.Ct.* 2525, 2541, 45 *L.Ed.*2d 562, 581–82 (1975); *State v. Yohnnson,* 204 *N.J.* 43, 59, 6 *A.*3d 963 (2010).

■ Waiver of constitutional rights may occur in civil as well as criminal cases. *See, e.g., LaManna v. Proformance Ins. Co.,* 184 *N.J.* 214, 225, 876 *A.*2d 785 (2005) (waiver of right to five-sixths jury verdict in civil trial); *Mt. Hope Dev. Assocs. v. Mt. Hope Waterpower Project, L.P.,* 154 *N.J.* 141, 147, 712 *A.*2d 180 (1998) (waiver of right to appeal in civil action); *Callen v. Sherman's, Inc.,* 92 *N.J.* 114, 137, 455 *A.*2d 1102 (1983) (waiver of constitutional rights in commercial context).

Under the circumstances of this case, we do not find a valid waiver. "[A] waiver of constitutional rights in any context must,

at the very *least,* be clear." *Fuentes v. Shevin,* 407 *U.S.* 67, 95, 92 *S.Ct.* 1983, 2002, 32 *L.Ed.*2d 556, 579 (1972); *see also Callen, supra,* 92 *N.J.* at 137, 455 *A.*2d 1102. But Khan was not asked to waive his free speech rights; he was asked—by different rules in three documents—to waive the right to post signs before getting Board approval, without any idea about what standards would govern the approval process. That cannot constitute a knowing, intelligent, voluntary waiver of constitutional rights.

We also question whether a clearer sign policy could permit a valid waiver for other reasons. Can fundamental constitutional rights be properly waived by including waiver language in the midst of a more than fifty-page, single-spaced document? Although we do not hold that the far greater protections required in the criminal arena apply to complex, commercial transactions, *see, e.g., Miranda v. Arizona,* 384 *U.S.* 436, 478–79, 86 *S.Ct.* 1602, 1630, 16 *L.Ed.*2d 694, 726 (1966) (outlining procedure for valid waiver of right against self-incrimination); *Faretta, supra,* 422 *U.S.* at 835, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581 (same for waiver of right to counsel); *State v. Crisafi,* 128 *N.J.* 499, 510–12, 608 *A.*2d 317 (1992) (same), it is unclear that the approach in this case can result in a *knowing* and *intelligent* waiver of fundamental constitutional rights.

We also note that tens if not hundreds of thousands of New Jersey residents live in developed communities like Mazdabrook. The proliferation of residential communities with standard agreements that restrict free speech would violate the fundamental free speech values espoused in our Constitution—the "highest source of public policy" in New Jersey. *See Twin Rivers, supra,* 192 *N.J.* at 371, 929 *A.*2d 1060 (internal quotation omitted). For that reason, we cannot accept that a complete waiver of free speech rights in one's home could be possible in this context. Instead, as discussed earlier, the exercise of those rights can be subject to reasonable time, place, and manner restrictions.

We do not need to address whether the unreasonable restrictions in this case run afoul of the protections of the Planned Real

Estate Development Full Disclosure Act. *See N.J.S.A.* 45:22A-44(b) (requiring that homeowners' association "exercise its powers and discharge its functions in a manner that protects and furthers the health, safety and general welfare of the residents of the community"); *see also Twin Rivers, supra*, 192 *N.J.* at 370, 929 *A.*2d 1060 (noting that "restrictive covenants established by homeowners' associations that unreasonably limit speech and association rights could be challenged under subsection (b) of the statute").

To the extent that Mazdabrook or the dissent relies on a restrictive covenants analysis, the Association's sign policy likewise fails. "[R]estrictive covenants on real property that violate public policy are void as unenforceable." *Twin Rivers, supra*, 192 *N.J.* at 370, 929 *A.*2d 1060 (citations omitted). When courts evaluate whether a covenant burdening land is enforceable, they must determine whether the covenant is reasonable. *See Davidson Bros., Inc. v. D. Katz & Sons, Inc.*, 121 *N.J.* 196, 210, 579 *A.*2d 288 (1990). Among other factors that inform that decision is "[w]hether the covenant interferes with the public interest." *Id.* at 211, 579 *A.*2d 288.

This Court explained in *Twin Rivers* that "restrictive covenants that unreasonably restrict speech—a right most substantial in our constitutional scheme—may be declared unenforceable as a matter of public policy." *Twin Rivers, supra*, 192 *N.J.* at 371, 929 *A.*2d 1060. Because the restriction in question is unreasonable and violates the State's Constitution, the covenant that memorializes it is unenforceable.

## VI.

For the reasons set forth above, we affirm the judgment of the Appellate Division.

Judge WEFING (temporarily assigned), dissenting.

The Public Offering Statement for Mazdabrook Commons provides in pertinent part, "[n]o signs are permitted on the exterior

or interior of any Unit, except for one 'For Sale' sign on the interior of a Unit." The Declaration of Rights and Covenants (Declaration) for Mazdabrook Commons precludes signs "in or upon any Building, the Common Facilities or any part thereof without the prior written consent of the Board." My colleagues have concluded that these provisions infringe on the free speech rights of defendant and thus have struck them down.

The record in this matter is sparse. Although the bench trial occurred on two separate days, that was due to the scheduling needs of the trial court and not because the parties called numerous witnesses to present extensive testimony on the enforceability of the sign restrictions. In fact, only two witnesses testified: the president of the Homeowners' Association and defendant. My colleagues note that "the vast majority" of the testimony (*op.* at 489, 46 *A.*3d at 511) dealt with defendant growing a rose vine [1] that the Association considered to be prohibited. While that characterization is accurate, it does not, in my judgment, convey the overall flavor of the proceedings. The testimony of the two witnesses fills 104 pages of the trial transcript; more than ninety of those pages are devoted to the rose vine. The issue of the sign restrictions was clearly viewed as tangential. More than forty years ago, this Court noted the need to exercise a "[m]aximum of caution" when confronted with an issue "involving highly significant policy considerations and ... wholly inadequate record." *Jackson v. Muhlenberg Hosp.*, 53 *N.J.* 138, 142, 249 *A.*2d 65 (1969). Time has not dissipated the value of such caution. Defendant's free speech rights certainly involve highly significant public policy considerations, but in my judgment the record on this discrete constitutional issue is wholly inadequate.

The following is but one example of the inadequacy of the record with respect to defendant's posting of political signs. De-

---

[1] Throughout this record, the term "rose vine" is used. I will continue that terminology for the sake of consistency, not accuracy. A rose is a shrub, not a vine. I infer the plant in question must have been a climbing rose.

fendant testified that he posted his signs after he saw signs for his political opponent posted on the Mazdabrook Commons model unit. There is no definitive evidence in this record, however, that those signs were ordered to be removed, as were those of defendant. If, indeed, those signs were permitted to remain when defendant was ordered to take his signs down, such selective enforcement would not be consonant with the duty of association board members to "act reasonably and in good faith." *Mulligan v. Panther Valley,* 337 *N.J.Super.* 293, 300, 766 *A.*2d 1186 (App. Div.2001). That the parties made no effort to clarify this ambiguity is a strong indication that they viewed the issue of defendant posting signs as both inconsequential and peripheral to the dispute about the rose vine.

The relevant testimony from the sparse record showed that defendant moved into Mazdabrook Commons in March 2003. In connection with his purchase, he received a copy of the Public Offering Statement, the Declaration, the By–Laws of the Homeowners' Association, and the rules and regulations adopted by the Association's board of trustees. He testified that he read the documents, and he never objected to any of their provisions. Defendant also made no assertion that he did not understand them. Thus, we do not have an allegation that defendant was misled or confused when he signed the contract to purchase property at Mazdabrook. We do not have an allegation that defendant was unaware of the terms or restrictions accompanying his purchase. We do not have an allegation that the language contained in either the Public Offering Statement or the Declaration is ambiguous or confusing.

In May 2005, defendant ran for municipal office. He decided to put up the two signs in question when he saw signs promoting the candidacy of his opponent placed on the model unit for the complex. After his signs had been up for several days, he received a notice that this placement violated the Association's master deed. Defendant made no complaint and removed his signs. Although the notice of violation informed him of his right

to be heard by the Association's board of trustees on the matter, he did not seek a hearing.

In fact, defendant raised no issue with respect to the enforcement of the sign restrictions until the Association filed an eight-count complaint in October 2008 seeking to collect outstanding fines, maintenance fees, and accumulated interest totaling more than $5000. In February 2009, defendant filed an answer and counterclaim in which he asserted that the assessment of fines totaling $75 ($25 per day for the three days the signs remained in place) for placing these signs abridged his free speech rights under the New Jersey and United States constitutions. The balance of the disputed assessments related entirely to the rose vine.

Less than five years ago this Court addressed a dispute between residents of a common-interest community and its governing association. *Comm. For A Better Twin Rivers v. Twin Rivers Homeowners' Ass'n,* 192 *N.J.* 344, 929 *A.*2d 1060 (2007). In that case, Justice Wallace, writing for the Court, traced the evolution of New Jersey's attempt to balance the free speech rights of one party with the private property rights of another. *Id.* at 357–62, 929 *A.*2d 1060. The Court concluded that the test articulated in *State v. Schmid,* 84 *N.J.* 535, 423 *A.*2d 615 (1980), was the appropriate standard to apply to the dispute between the residents of Twin Rivers and the governing association. *Twin Rivers, supra,* 192 *N.J.* at 365, 929 *A.*2d 1060. Under *Schmid,* a court is to take into account

(1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.
[*Schmid, supra,* 84 *N.J.* at 563, 423 *A.*2d 615.]

The community in *Twin Rivers* filled an area of approximately one square mile and included both residential and commercial properties. *Twin Rivers, supra,* 192 *N.J.* at 350, 929 *A.*2d 1060. It had a population of some 10,000 residents. *Ibid.* The homeowners' association performed certain functions handled tradition-

ally by a municipality, such as providing street maintenance, snow removal, and street lighting. *Ibid.*

The Court analyzed the three *Schmid* factors against that factual background and found each to weigh in favor of the association. *Id.* at 365–67, 929 *A.*2d 1060. Accordingly, it upheld the restriction imposed by the board of trustees on the placement of signs. *Id.* at 367, 929 *A.*2d 1060. The Court did not hesitate to conclude that

> Twin Rivers is not a private forum that invites the public on its property to either facilitate academic discourse or to encourage public commerce. Rather, Twin Rivers is a private, residential community whose residents have contractually agreed to abide by the common rules and regulations of the Association. The mutual benefit and reciprocal nature of those rules and regulations, and their enforcement, is essential to the fundamental nature of the communal living arrangement that Twin Rivers residents enjoy.
>
> [*Ibid.*]

It is the third *Schmid* factor that divided the Appellate Division in this matter and that my colleagues conclude weighs in favor of Khan. I am unable to join my colleagues' assessment. Mazdabrook Commons, by way of contrast with Twin Rivers, is comprised of approximately two hundred townhouses, and it is entirely residential in nature. While the Association provides landscaping services to the residents, it performs no functions analogous to those provided by a municipality. Given that the Court in *Twin Rivers* concluded the nature of the much larger and diverse common-interest community did not "weigh in favor of finding that the Association's rules and regulations violated plaintiffs' constitutional rights," *ibid.,* I view it as incongruous to find here a constitutional violation in the context of Mazdabrook Commons, a much smaller, purely residential community.

My colleagues rightly note our nation's and our state's commitment to a free and vigorous debate of public questions. I have no quarrel with that commitment; I embrace it. In my judgment, however, individuals are equally entitled to seek shelter from political debate and division. If a group of individuals wish to live in a common-interest community that precludes the posting of signs, political or otherwise, and have agreed freely to do so, and

there is no showing of overreaching or coercion, I would adopt the principles enunciated in Judge Miniman's dissent in the Appellate Division, that these mutually-agreed upon covenants ran with the land, were reasonable, and were enforceable. As Judge Miniman noted:

> Here, the prohibition on signs is contained in the recorded Declaration of Covenants and Restrictions, By–Laws, and Rules and Regulations—it was not simply a restriction adopted by the Board of Trustees, as in *Twin Rivers, supra,* at 350–51 [929 *A.*2d 1060]. The restriction on signs and the right to sue to enforce it are included in the bundle of rights, restrictions, encumbrances, and easements contained in the deed to defendant's unit. ... Thus, defendant and all other unit owners expressly agreed that they would not violate the prohibition on signs and each owner was empowered to enforce that restriction.

Some may question the choice to avoid political controversy; I simply recognize the right to make that choice.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, and PATTERSON—5.

*For reversal*—Judge WEFING (temporarily assigned)—1.